06-3950-cv
Paneccasio v. Unisource Worldwide

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: December 13, 2007          Decided: July 7, 2008)

Docket No. 06-3950-cv

- - - - - - - - - - - - - - - - - - - -X

EUGENE PANECCASIO,

              Plaintiff-Appellant,

          - v.-

UNISOURCE WORLDWIDE, INC., GEORGIA-
PACIFIC CORP., IKON OFFICE SOLUTIONS,
INC., FORMERLY KNOWN AS ALCO STANDARD
CORP., BOARD OF DIRECTORS, IND. & AS
FIDUCIARIES OF IKON OFFICE SOLUTIONS,
INC., AND W.J. HOPE, JR., IND. & AS
ADMIN. & FIDUCIARY OF THE 1991 IKON
OFFICE SOLUTIONS INC. DEFERRED
COMPENSATION PLAN,

              Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - -X


     Before:  JACOBS, Chief Judge, POOLER and SACK, Circuit
              Judges.

     Appeal from a grant of summary judgment dismissing

ERISA and ADEA claims, and declining to reinstate state law

claims previously dismissed as preempted.  Plaintiff argues

principally that defendants should be equitably estopped from terminating a deferred compensation plan as to him by reason of representations made in an early retirement package.  Affirmed.

ANDREW B. BOWMAN, Westport, Connecticut, for Plaintiff-Appellant.

FELIX J. SPRINGER (Howard Fetner, on the brief), Day Pitney LLP, Hartford, Connecticut, for Defendants-Appellees Unisource Worldwide, Inc. and Georgia-Pacific Corporation.

KAY KYUNGSUN YU, Pepper Hamilton LLP, (Joseph J. Costello, Morgan Lewis & Bockius LLP, on the brief), Philadelphia, Pennsylvania, for Defendants-Appellees Alco Standard Corporation, Ikon Office Solutions, Inc, Board of Directors of Ikon Office Solutions, Inc., and W.J. Hope, Jr.

DENNIS JACOBS, Chief Judge:

Plaintiff Eugene Paneccasio ("Paneccasio") elected to participate in his company's deferred compensation plan at a level designed to provide him, once fully vested, with a $15,000 annuity for ten years following his retirement no earlier than age 65, plus life insurance.  The plan was

2

subject to termination, at the company's election, on payment of certain sums to participants depending on whether they were or were not yet receiving benefits. In 1994, when Paneccasio was 57, he was offered an early retirement package, which he accepted, and which granted accelerated vesting in the deferred compensation plan making him eligible to receive 65 percent of the stated benefits beginning at age 65, along with a number of other inducements that are not at issue here. In 2000, six months short of Paneccasio's 65th birthday, the company terminated the deferred compensation plan and, as required by the termination provision, paid Paneccasio his deferred income at six percent interest. Also pursuant to the termination provision, the life insurance benefit ended.

Paneccasio argues that the early retirement package guaranteed that he would receive benefits under the deferred compensation plan at age 65 and that the plan's termination provision was ineffective as to him, or disabled by estoppel. In support he cites assurances in the early retirement package that he would receive greater benefits if he took it, and that his benefits under all plans would be paid at age 65. Paneccasio seeks his 65 percent

participation in the ten year annuity and life insurance benefit that were to begin at age 65. The company argues that a broad and bolded disclaimer in the early retirement package referred Paneccasio to the plan documents (which included the termination provision) and said that they would control.

The United States District Court for the District of Connecticut (Droney, J.), granted summary judgment dismissing Paneccasio's complaint, which alleged violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq., and state statutory and common law. Paneccasio appeals. We affirm.

## BACKGROUND

From 1971 until he retired in 1994 at age 57, Paneccasio worked for a division of defendant Unisource Worldwide, Inc. ("Unisource"), which was a wholly-owned subsidiary of defendant Alco Standard Corporation ("Alco"). By the time Paneccasio retired, he was a vice president of

4

sales and national accounts.[1]

### A. 1991 Deferred Compensation Plan

Paneccasio elected to participate at its inception in the Alco Standard Corporation 1991 Deferred Compensation Plan (the "1991 Plan"), which was offered to certain highly compensated employees of Alco and its subsidiaries including Unisource. The 1991 Plan, which was a type of plan commonly referred to as a "top hat" plan, furnished benefits supplemental to the pension plan benefits already provided by Unisource. (Paneccasio had previously vested in the pension plan and in Alco's 1980 deferred compensation plan.)

The 1991 Plan allowed participants to defer a portion of their income until retirement and provided two different life insurance components: coverage for the participant at a certain level prior to retirement, and transfer of a life insurance policy to the participant at age 65. Eligible employees had the choice of selecting among three options

---

[1] In 1997, Alco changed its name to IKON Office Solutions, Inc. ("IKON"), and spun off Unisource. But Alco, and then IKON, retained control over the pertinent benefit plan during all times relevant to this lawsuit. In 1999, Georgia-Pacific Corporation ("Georgia-Pacific") acquired Unisource.

under the Plan. Paneccasio chose Option II, which provided that when he retired and reached age 65 he would receive an annuity in the amount of $15,000 per year for ten years, and would own a life insurance policy with a $95,000 cash value and a paid-up death benefit of $375,000. If Paneccasio died before age 65, the death benefit would be $450,000.

Paneccasio had the option to elect vesting after five years, which he did when he signed up. An employee who terminated employment before "vesting" would no longer be allowed to participate in the Plan, and his aggregate salary deferrals at the time his employment ended would be reimbursed without interest.

The 1991 Plan also gave Alco's Board of Directors the sole authority to terminate the Plan:

> Termination. The Board of Directors of Alco shall have the right to terminate the Plan in its entirety and not in part at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact upon Alco.

Upon termination, a participant would no longer be entitled to an annuity and life insurance benefit. Instead, a participant would be entitled only to a lump-sum distribution, in amounts calculated based on whether the

6

participant's benefit payments had commenced (Paneccasio's

payments had not when the Plan was terminated):

> Alco shall have no liability or
> obligation under the Plan or the
> Participant's Participation Agreement (or
> any other document), provided that 1)
> Alco distributes, in lump sum, to any
> participant whose benefits have not
> commenced, the value of the amount of the
> Participant's deferrals to the date of
> termination plus interest (compounded
> annually) at a rate of 6% per annum; and
> 2) Alco distributes, in a lump sum, to
> any Participant whose benefit payments
> have commenced, all amounts thereafter
> due, in an amount as calculated in
> accordance with Paragraph [20],
> "Acceleration of Benefits."  Such lump-
> sum distribution, at Alco's election, may
> be made in the form of cash, or life
> insurance, or both.

(emphasis added).  At his deposition, Paneccasio testified

that he read and understood the terms of the 1991 Plan when

he elected to participate.  He further testified that he had

read the termination provision of the Plan, acknowledged

that the Board had the right to terminate the Plan under

that provision, and understood what benefit would be payable

if the Plan were terminated.


### B.  Early Retirement Package

In 1994, Unisource offered an Early Retirement Package

7

("ERP") to employees age 55 and older. Paneccasio, who was 57, accepted, and retired effective April 1, 1994. The ERP was described in a brochure provided to Paneccasio entitled, "Your Personal Early Retirement Package: A Window of Opportunity." As a result of his election, Paneccasio received, among other things: a one-time cash bonus of $7,500; full vesting in the company's pension plan; continued medical coverage until age 65; term life insurance paid by Unisource until age 65; full vesting in an Alco stock participation plan, with stock worth $471,840; full vesting in the 1980 deferred compensation plan, resulting in a $3,024 monthly payment starting at age 65 and continuing for 10 years; and 65 percent vesting in the 1991 Plan. Other than his claims relating to the 1991 Plan, it is undisputed that Paneccasio received all benefits pertaining to his early retirement.

But for the ERP, an employee who left employment prior to vesting in the 1991 Plan would be entitled only to the return of the deferred salary in a lump sum, without interest. For such employees, the ERP conferred the benefit of accelerated partial vesting. Partial vesting allowed the retiring employee to leave his deferred salary in the Plan

8

where it would continue appreciating, and thereby enjoy the deferral of tax on the income until age 65, at which time he would receive annuity and life insurance benefits proportionate to his vesting.  Partial vesting also allowed the retiring employee to retain his interest in the pre-age-65 life insurance benefit of $450,000, as long as he continued to pay a quarterly premium of $231.75 through age 65.

Attached to Paneccasio's copy of the ERP brochure was a personalized statement called, "A Personal Look . . . At Your Retirement," which estimated the benefit enhancements specifically applicable to Paneccasio under the various Unisource benefit plans.  As to the 1991 Plan, the "Personal Look" calculated that Paneccasio would be eligible at age 65 to receive 65 percent of the Plan's Option II benefits, i.e., $9,750 each year for 10 years.  With respect to the 1991 Plan's life insurance policy, the ERP's partial vesting would allow for a post-age-65 cash value of $61,750 and a death benefit of $243,750.

Other than providing for accelerated vesting in the 1991 Plan, the ERP brochure did not address any other feature of the Plan.  It did not alert participants that

9

Alco retained the right to terminate the 1991 Plan, or explain how early termination might affect the 1991 Plan's annuity and life insurance provisions.  The ERP brochure did, however, include a broad disclaimer applicable to all benefits plans discussed in the brochure.  In bold type in a highlighted box, it said:

> In an effort to keep the language as clear and non-technical, yet correct, as possible, the benefits described in this brochure are only summaries of the Early Retirement window's major provisions. More detailed information is available from plan documents and insurance contracts.  In case of any dispute, the official legal documents or contracts will govern over this brochure.

This disclaimer is followed by a more specific one in which Alco "reserves the right to change the medical and dental plans, including offering other plan(s) of comparable coverage and cost."  (No such specific reservation is made as to the 1991 Plan.)

The brochure counsels employees to "ask your local Human Resources representative for assistance in making this very important decision," and to "gather your personal resources, consider the advantages and disadvantages, talk to your financial advisor, and make your decision."  The description of the ERP's effect on various benefit plans,

10

including deferred compensation plans, concludes with the warning: "IMPORTANT: This section is not meant as legal or financial advice; please consult with your tax advisor or financial planner before making any decisions." Paneccasio testified at his deposition that the only person he consulted before accepting early retirement was his spouse. He did not attend company presentations regarding the ERP and did not consult a human resources representative at the company or a personal financial advisor. He does not recall reviewing 1991 Plan documents before making his decision.

## C. Termination of the 1991 Plan

In 1997, Alco was renamed IKON Office Solutions, Inc. ("IKON"). In 2000, the IKON Board of Directors decided to terminate the 1991 Plan on the grounds of unfavorable interest rates and declining participation. Paneccasio and other participants of the 1991 Plan were notified in October 2000 of the pending termination, which became effective on December 31, 2000. In accordance with the termination provision, participants who were receiving monthly benefits would receive a lump sum "Acceleration of Benefits," essentially the present value of future benefits payments.

11

Participants who were not yet receiving monthly benefits (including Paneccasio), whether or not vested, would receive a lump sum repayment of deferrals plus six percent interest. All participants would lose any continuing claim to the life insurance benefits.

At the time of termination, Paneccasio was approximately six months shy of his 65th birthday and therefore had not yet commenced receiving benefits under the 1991 Plan. As a result, he was informed he would receive a lump sum termination benefit of $75,419.22, composed of $46,283.25 in deferrals plus $29,135.97 in interest.

By letter to IKON dated November 10, 2000, Paneccasio: expressed his belief that because he was 65 percent vested in the 1991 Plan under the ERP, he was entitled to reject the termination lump sum payment; claimed that the ERP modified the 1991 Plan so that it could not be terminated as to him; and demanded benefits under the original terms of the 1991 Plan, i.e., (1) the $9,750 annuity beginning at age 65 and continuing for 10 years, and (2) the life insurance benefit of a post-age 65 cash value of $61,750 and death benefit of $243,750. These are the benefits in dispute in this lawsuit.

12

IKON, through the Plan Administrator, W.J. Hope, Jr., responded on November 30, 2000 that Paneccasio had no option other than to take the lump sum payment described in the termination provision because "[v]esting does not supercede the termination provisions found in Section 19 . . . of the Plan." On December 15, 2000, Paneccasio appealed this denial of benefits, and Hope referred the matter to IKON's Retirement Plans Committee for review. On July 3, 2001, Paneccasio's appeal was denied, and he was entitled to receive his termination payment of $75,419.22.

### D. EEOC Complaint and Federal Lawsuit

In July 2001, more than seven years after his retirement from Unisource, Paneccasio filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that Unisource, Alco, IKON, Georgia-Pacific, the IKON Board of Directors and Hope (collectively, "defendants"), had discriminated against him on the basis of age by terminating the 1991 Plan after inducing him to elect early retirement. On August 9, 2001, the EEOC dismissed Paneccasio's complaint for failure to state a claim under the ADEA, and issued a right to sue letter.

Paneccasio then filed a complaint in the District of Connecticut alleging violations of the ADEA and ERISA, breach of contract, and related state statutory and common law claims. Defendants moved to dismiss Paneccasio's complaint, and the district court granted the motion as to the state law claims, holding them preempted under ERISA because they related to the 1991 Plan. Following discovery, the district court granted defendants' motion for summary judgment on the remaining ADEA and ERISA claims.

As to the ADEA claim, the district court ruled that it was untimely filed and that there was no ground for equitable tolling, and (in the alternative) that Paneccasio could not establish a prima facie case of age discrimination. As to the ERISA claim, the court ruled (inter alia) that defendants could not be equitably estopped from denying liability on Paneccasio's ERISA claim because Paneccasio failed to present evidence of promises or misrepresentations at the time of the ERP that contradicted 1991 Plan provisions. See Paneccasio v. Unisource Worldwide, Inc., No. 3:01-cv-2065, 2006 WL 2128647, 2006 U.S. Dist. LEXIS 84821 (D. Conn. July 26, 2006). Paneccasio appeals the district court's summary judgment ruling and its

14

refusal to reinstate the state law claims.

We affirm the dismissal of the ADEA claim as untimely. We affirm the dismissal of the ERISA claim on the merits. Because the tolling issue that bears upon the ADEA claim depends on the merits of the ERISA claim, we discuss the ERISA claim first.

## **DISCUSSION**

We review de novo the district court's grant of summary judgment, drawing all factual inferences in favor of the non-moving party.  See Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).

## **A.  ERISA**

The complaint alleges that:  the 1991 Plan is subject to ERISA; it was modified by the ERP brochure to guarantee future benefits; termination of the Plan breached defendants' fiduciary duties and denied benefits in violation of ERISA; and defendants are equitably estopped from denying liability because Paneccasio relied to his detriment on representations about future benefits in the ERP brochure.  Paneccasio seeks to recover the benefits due

15

to him had the Plan not been terminated.

"Top hat plans," such as the 1991 Plan, "are exempt from many provisions of ERISA, including the participation and vesting, funding, and fiduciary responsibility requirements, see 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1), but like qualified plans, they are subject to disclosure requirements, to civil enforcement, and to the duty to have a claims procedure, see 29 U.S.C. §§ 1021, 1132, 1133." Eastman Kodak Co. v. STWB, Inc., 452 F.3d 215, 217 (2d Cir. 2006). Thus, to the extent Paneccasio's ERISA claim relies on an assertion of breach of fiduciary duty, it was properly dismissed. See Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 290 (2d Cir. 2000) ("[T]he fiduciary responsibility provisions of ERISA do not apply to top hat plans . . . ."). ERISA's civil enforcement provisions afford Paneccasio his sole remedies for recovery of benefits due, or for enforcement of the terms of the 1991 Plan. See ERISA § 501(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209 (2002) (expressing reluctance to "extend[] remedies not specifically authorized by [ERISA's] text"); Mertens v. Hewitt Assocs., 508 U.S. 248, 254 (1993) (noting that

16

ERISA's "carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did <u>not</u> intend to authorize other remedies that it simply forgot to incorporate expressly'" (quoting <u>Massachusetts Mut. Life Ins. Co. v. Russell</u>, 473 U.S. 134, 146-47 (1985))).[2]

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). If the benefit plan confers such discretion, we review the administrator's decisions under the arbitrary and capricious standard. <u>See Krauss v. Oxford Health Plans, Inc.</u>, 517 F.3d 614, 622 (2d Cir. 2008).

The 1991 Plan's termination provision grants

---

[2] A claim for recovery of benefits under ERISA § 501(a)(1)(B) can be brought only against a covered plan, its administrators or its trustees. <u>See</u> <u>Chapman v. ChoiceCare Long Island Term Disability Plan</u>, 288 F.3d 506, 509-10 (2d Cir. 2002) ("'In a recovery of benefits claim, only the plan and the administrators and trustees of the plan in their capacity as such may be held liable.'" (quoting <u>Leonelli v. Pennwalt Corp.</u>, 887 F.2d 1195, 1199 (2d Cir. 1989))). Unisource and Georgia-Pacific fall into none of these categories, and therefore the ERISA claim against these defendants fails on this alternative ground.

17

discretionary authority to the IKON Board of Directors to terminate the Plan "at any time it determines that proposed or pending tax law changes or other events cause, or are likely in the future to cause, the Plan to have an adverse financial impact on Alco." This language empowers the IKON Board alone to decide whether to terminate the Plan, at any time and based on any events it considers likely to have an adverse financial impact. Its decision is not constrained by any objective or third-party measures of the company's fiscal distress. See id. at 623 (holding that a plan's grant to an administrator of the right to "determine" an issue conferred discretion where the decision-making power was not constrained by objective standards); Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d Cir. 2005) ("A reservation of discretion need not actually use the words 'discretion' or 'deference' to be effective, but it must be clear.").

We agree with the district court that the IKON Board's decision to terminate the 1991 Plan was not arbitrary or capricious. IKON presented evidence that the Plan was terminated because of declining interest rates, greater cash outlays related to the lower interest rates for the split-

18

dollar life insurance policies, and a reduction in the number of participants in the plan, all of which had an adverse financial impact on IKON. Specifically, there was evidence that, in 1999, in connection with the 1991 Plan, IKON incurred a cash outlay of $2.4 million as compared to the $1.5 million originally anticipated, and suffered a loss of $1.3 million instead of the $1 million gain originally anticipated. Paneccasio's only rebuttal was the conclusory assertion that IKON Board's "real" reason for terminating the Plan was a financial need relating to the settlement of an unrelated securities class action. Paneccasio thus failed to raise a genuine issue of material fact as to the lawfulness of the Plan's termination and the payment of termination benefits. See Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995) (holding that administrator's decision will be overturned "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law" (internal quotation marks omitted)).

Paneccasio argues that, even if the 1991 Plan was properly terminated, defendants should be estopped from terminating the Plan as to him because the ERP brochure falsely induced him to retire by misrepresenting the future

19

benefits available under the Plan.  Promissory or equitable estoppel is available on ERISA claims only in "extraordinary circumstances."  Devlin v. Transp. Commc'n Int'l Union, 173 F.3d 94, 101 (2d Cir. 1999) (internal quotation marks omitted); see Bonovich v. Knights of Columbus, 146 F.3d 57, 62 (2d Cir. 1998); Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993).  To prevail on an estoppel claim under ERISA, Paneccasio must prove "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced," and must "adduce[] . . . facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well."  Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 151 (2d Cir. 1999) (internal quotation marks omitted) (alterations in original).

Panecassio claims to have relied on an implicit guarantee in the ERP brochure that he would receive the 1991 Plan benefits at age 65.  No such promise was made in so many words, either in the ERP brochure or in any oral representations at the time Paneccasio elected early retirement.  Paneccasio advances several theories.

Paneccasio would infer a guarantee of future benefits

20

from this statement in the ERP brochure: "If you retire under this special Early Retirement window, you will receive greater benefits than you would if you retire later." Paneccasio also relies on the brochure's chart comparing benefits from the "Special Early Retirement Window" (providing for "partial vesting in the 1991 Alco program; benefit payable at age 65"), and the "Regular Early Retirement" (providing for "[v]esting in your benefits, if any, under . . . 1991 Alco program[] based on plan participation at retirement; benefit payable at age 65"). Paneccasio argues that the promise of "greater benefits" amounted to a guarantee that he would be paid an annuity and retain his life insurance at age 65. This interpretation is not supported by the cited language, which promises no more than a "greater benefit" by virtue of immediate partial vesting. Paneccasio received the entire value of partial vesting: continued participation in the 1991 Plan after early retirement, with the concomitant tax advantages and appreciation of his investment. Without vesting, early retirement would have required Paneccasio to exit the 1991 Plan, receiving only repayment of his deferred income without interest. The promise of "greater benefits" was

21

thus fulfilled.

Paneccasio argues that by modifying the vesting provision of the 1991 Plan, the ERP brochure essentially rescinded the termination provision as well.  Nothing in the 1991 Plan documents suggests this sort of interdependence between the two provisions.  Neither provision refers to the other.  The Board's authority to terminate the Plan is not qualified by the vested status of participants, and the compensation owed to participants upon termination depends solely on whether they began receiving benefits payments; vesting is irrelevant to that calculation.  The ERP's silence on every provision of the 1991 Plan other than vesting cannot be read to rescind the termination provision, especially in view of the ERP's disclaimer referring participants to Plan documents.  See Tocker v. Phillip Morris Cos., 470 F.3d 481, 488-89 (2d Cir. 2006) (holding that summary plan description did not divest administrator of discretion to determine benefit eligibility when it was silent on subject and referred participants to governing documents).

Paneccasio sees a guarantee of future benefits in the brochure's statement:  "Your benefits under all of the Plans

22

will be paid to you monthly at age 65." This sentence is troublesome when read in isolation because of its unqualified assurances that benefits "will be paid." However, the sentence is part of the brochure's section on deferred compensation plans, which makes clear that the only new benefit offered by the ERP in connection with such plans is immediate vesting.[3] This section of the brochure does not suggest rescission of the 1991 Plan's termination provision, especially in light of the brochure's other representations about the 1991 Plan and the disclaimer that "the official legal documents or contracts will govern" in any conflict between benefit plans and the ERP brochure.

The ERP's disclaimer nonetheless poses some

---

[3] The section of the ERP brochure titled "Alco Standard Corporation Deferred Compensation Plans" reads in its entirety:

> If you participate in the 1980 or 1985 Alco Standard Corporation Deferred Compensation Plans, your benefit(s) will become fully vested. Benefits in the 1991 Plan will become 65% vested if you elected the five year option and 32.5% vested if you elected the ten year option. Under the 1991 Plan, you must continue to pay life insurance premiums to age 65.
>
> Your benefit(s) under all of the Plans will be paid to you monthly at age 65. If you participate in any of these programs, see your personalized statement for the monthly benefit payable at age 65 under all of these programs.

interpretive problems. On its face, the disclaimer is comprehensive--it applies to all benefit plans affected by the ERP, it discounts the ERP brochure's descriptions of those plans as "only summaries," and it refers employees to "the plan documents and insurance contracts." But this general disclaimer is followed by a specific reservation of the right to modify the medical and dental plans, which may have suggested to employees that benefit plans other than medical and dental plans were <u>not</u> subject to a similar reservation of rights. As to the 1991 Plan, the absence of a specific reservation of rights may have suggested that the Plan's provisions for amendment or termination were superseded by the ERP.

On balance we reject this interpretation. The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract. In this case, the contract consists of the ERP and its constituent benefits plans, which must be read together, giving effect to all terms. <u>See</u> <u>Restatement (Second) of Contracts</u> § 202(2) (2008) ("all writings that are part of the same transaction are interpreted together"); <u>Adams v. Suozzi</u>, 433 F.3d 220, 228 (2d Cir. 2005). Although specific language in a contract will prevail over general language

where there is an inconsistency between two provisions, see ABN Amro Verzekeringen BV v. Geologistics Americas, Inc., 485 F.3d 85, 102 (2d Cir. 2007) (citing Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46 (N.Y. 1956)), there is no inconsistency between the ERP's general disclaimer addressed to all constituent benefits plans, and its more specific one dealing with medical and dental plans. The specific disclaimer does not on its face modify or limit the effect of the general disclaimer, and each disclaimer may be fully enforced without compromising the other. We thus conclude there is "no factual predicate for application of the principle that where a specific contract provision conflicts with a more general provision, the specific provision controls[,] . . . [s]ince there is no inconsistency." Croce v. Kurnit, 737 F.2d 229, 237-38 (2d Cir. 1984); see also India.Com, Inc. v. Dalal, 412 F.3d 315, 321 (2d Cir. 2005) (holding that specific provision in contract did not supersede general language where doing so would nullify express intent of latter); cf. United States v. Mohammed, 27 F.3d 815, 820-21 (2d Cir. 1994) (holding inapplicable the rule of statutory construction giving specific language precedence over more general language where "there is no conflict of language"). Striving, as we do, to give meaning

25

to every part of the parties' agreement, we see no basis in the specific disclaimer for curtailing the general disclaimer's affirmation of the continuing validity of all other benefit plan documents.

Yet the wording of the ERP makes this a close question. It would have been advisable for the ERP's general disclaimer to reference the right of termination of the 1991 Plan, especially in view of the specific reservation of the right to modify the medical and dental plans. A specific reservation of rights is especially prudent when the exercise of a right of termination will dramatically revise financial outcomes for plan participants, in this case by replacing an annuity and life insurance benefit with a lump sum payment.

In Paneccasio's case, however, he adduced no facts raising a genuine issue of material fact as to a promise of benefits notwithstanding termination. Nothing in the ERP constitutes a guarantee of benefits at age 65, and Paneccasio has presented no evidence of any promises or misrepresentations outside the ERP. In the absence of such a promise, there can be no detrimental reliance. See Aramony, 191 F.3d at 151. To the extent Paneccasio relied

on his own misreading of the ERP to retire earlier than he would have otherwise, his reliance was unreasonable and does not support estoppel.  See id. at 152-153.  On this record, Paneccasio's ERISA claim was properly dismissed on summary judgment.

## B.  ADEA

Paneccasio alleges that, based on his age, Alco and Unisource wrongfully induced him to take early retirement in 1994 to his financial detriment.[4]  Paneccasio filed an EEOC charge raising this claim in July 2001, seven years after his retirement.  Under the ADEA, Paneccasio was required to file a charge with the EEOC within 300 days of the allegedly unlawful employment practice.  See 29 U.S.C. § 626(d)(1)-(2); Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 325-28 (2d Cir. 1999) (filing deadline of 180 days is extended to 300 days where the alleged discrimination occurs in a state with its own anti-discrimination laws and enforcement agency, regardless of whether the charge is initially filed with the state).  Paneccasio argues that the period between

---

[4] Paneccasio does not argue that the termination of the 1991 Plan, effective December 31, 2000, was motivated by age bias.

27

his March 31, 1994 retirement and the December 31, 2000 termination of the 1991 Plan should be tolled because the defendants fraudulently concealed his ADEA claim from him.

Although ADEA time periods ordinarily start running upon the employer's commission of a discriminatory act, we have recognized that equitable tolling might be applied if, inter alia, "the employee was actively misled by his employer" or "he was prevented in some extraordinary way from exercising his rights." Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 24 (2d Cir. 1985); see Zerilli-Edelglass v. New York City Transit Auth., 333 F.3d 74, 80 (2d Cir. 2003) ("[E]quitable tolling is only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights." (internal quotation marks, citations and alterations omitted)). "[T]o merit equitable relief, a plaintiff must have acted with reasonable diligence during the time period she seeks to have tolled." Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 512 (2d Cir. 2002). Paneccasio argues that he was prevented from exercising his ADEA rights by his employers' active misrepresentation of the inducements to early retirement.

The misrepresentation claim stands on no better footing than the allegations offered to support Paneccasio's ERISA estoppel claim (that the ERP guaranteed payment of the 1991 Plan benefits when Paneccasio turned 65, and that termination of the 1991 Plan would not be effective as to him). Consistent with our ruling on the ERISA claim, we conclude that the ERP brochure's representations about the 1991 Plan do not constitute fraudulent inducement justifying equitable tolling. Read fairly, as a whole, the ERP did not call into question the continuing validity of the 1991 Plan documents, which included the termination provision. The termination provision explained that, if the employer exercises its discretion to terminate the Plan, participants would receive lump sum pay-outs, and not the monthly benefit and continued life insurance. Paneccasio testified that when he enrolled in the 1991 Plan, he read and understood the 1991 Plan's termination provision. He has identified no misrepresentation or ambiguity in the 1991 Plan, or the ERP's discussion of the 1991 Plan, that prevented him from timely exercising his rights under the ADEA, if any, with respect to the offer of early retirement.

There is no record evidence that defendants anticipated

early termination of the 1991 Plan, or euchred Paneccasio into early retirement while they were planning to terminate the Plan before he could begin collecting benefits. Paneccasio testified that he had no information suggesting that defendants knew in 1994 that the 1991 Plan would be terminated in 2000.  The undisputed evidence is that defendants began discussing termination of the Plan in 1999 or 2000, and decided to terminate the Plan in 2000. Paneccasio has thus failed to adduce evidence that he was kept in ignorance by misleading conduct of defendants at the time the ERP was offered, or since.  Zerilli-Edelglass, 333 F.3d at 79-81 (upholding denial of equitable tolling where plaintiff was in possession of all relevant documents and failed to act diligently).  Because his EEOC charge was untimely, his ADEA claim is barred.

## C.  Preemption

Paneccasio seeks to revive his state law claims, arguing that they are not preempted by ERISA because the 1991 Plan is a top hat plan exempt from certain ERISA requirements.  The argument has no merit.  As noted previously, top hat plans are not exempt from ERISA's

30

administration and enforcement provisions. See 29 U.S.C. §§ 1132-1145. Among these provisions is the preemption rule, by which ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. 29 U.S.C. § 1144(a) (with exceptions not relevant here). The wording provides no basis for holding that, of the various administration and enforcement provisions, the preemption provision alone is inapplicable to top hat plans.

The preemption "provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)). In Alessi, the Supreme Court observed that "[t]he only relevant state laws, or portions thereof, that survive this pre-emption provision are those relating to plans that are themselves exempted from ERISA's scope." Alessi, 451 U.S. at 523 n.20. Preemption thus applies to every plan covered by ERISA, which necessarily includes top hat plans.

The purpose of ERISA preemption is to ensure that all covered benefit plans will be governed by unified federal

31

law, thus simplifying life for employers administering plans in several states, because "[a] patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987). Employers might well cut back on benefit plans if faced with the expense and difficulty of satisfying varied and conflicting requirements of state laws. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 105 n.25 (1983). We see no reason to create an exception for top hat plans, and subject them to the impracticalities and counter-incentives of state-level interference in their administration. Other circuits that have reached this issue agree, dismissing state law claims that involve top hat plans. See Cogan v. Phoenix Life Ins. Co., 310 F.3d 238, 242-43 (1st Cir. 2002) (affirming dismissal based on preemption of state law breach of contract claim for top hat benefits); Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 516 (5th Cir. 2002) (affirming dismissal based on preemption of state law fraud claims because "[t]he underlying conduct alleged by [plaintiff] cannot be severed from its connection to the [top hat] Plan"); see also Starr v. MGM Mirage, No. 2:06-cv-00616,

32

2006 WL 3290299, at \*3 (D. Nev. Nov. 7, 2006) (dismissing as preempted plaintiff's state law claims for breach of fiduciary duty, fraud, oppression and malice relating to a top hat plan); cf. Garratt v. Knowles, 245 F.3d 941, 944-45, 949 (7th Cir. 2001) (holding that state law complaint seeking benefits under top hat plan was properly removed to federal court because all state law claims were preempted). Accordingly, we hold that ERISA preempts state law claims that relate to top hat plans.

Preemption in this case depends on whether Paneccasio's state law claims "relate to" the 1991 Plan. "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Shaw, 463 U.S. at 96-97. As to state statutory claims, ERISA preempts those that "provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee." Aetna Life Ins. Co. v. Borges, 869 F.2d 142, 146 (2d Cir. 1989). As to state common law claims, ERISA preempts those that seek "to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not

33

attempt to remedy any violation of a legal duty independent of ERISA." Aetna Health Inc. v. Davilla, 542 U.S. 200, 214 (2004); see Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 145 (1990) (ERISA preempts claims that "purport[] to provide a remedy for the violation of a right expressly granted by [ERISA]").

Paneccasio's state law claims sound in breach of contract, breach of the covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act, reckless misrepresentation, negligent misrepresentation, and tortious interference with contract. Each claim is premised on the termination of the 1991 Plan and resulting denial of benefits under that Plan; each makes explicit reference to the Plan; and each would require reference to the Plan in the calculation of any recovery. Consequently, each of Paneccasio's state law claims "relates to" a covered plan and is preempted by ERISA. Accord Devlin v. Transp. Commc'n Int'l Union, 173 F.3d 94, 101 (2d Cir. 1999) (applying preemption to contract claim that "challenges the [union's] effort to modify [a medical benefits] plan"); Kolasinski v. Cigna Healthplan of CT, Inc., 163 F.3d 148, 149 (2d Cir. 1998) (per curiam)

34

(applying preemption to breach of contract and unfair trade practices claims arising out of failure to pay medical benefits); Smith v. Dunham-Bush, Inc., 959 F.2d 6, 10 (2d Cir. 1992) (applying preemption to breach of contract and negligent misrepresentation claims because "the oral representation underlying this suit deals expressly and exclusively with the appellant's [pension] benefits").

For the foregoing reasons, the judgment of the district court is affirmed.