07-2658-cv
Giordano v. Thomson

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

------------

August Term 2008

Submitted: September 18, 2008          Decided: April 27, 2009

Docket No. 07-2658-cv, 07-2887-cv

----------------------------------------------------X

JOSEPH J. GIORDANO,

                    Plaintiff-Appellant-Cross-Appellee,

        - against -

JOHN B. THOMSON, JR., THOMSON INDUSTRIES, INC., and DANAHER
CORPORATION,

                    Defendants-Appellees-Cross-Appellants.

----------------------------------------------------X

        Before:   FEINBERG, WALKER, and LIVINGSTON, Circuit
                  Judges.

                  WILLIAM DAN BOONE and Ngozi Evelyn Bolin, Bolin &
                        Boone, New York, New York, for plaintiff-
                        appellant-cross-appellee.

                  JOHN  T.  MORIN  and  Jennifer  L.  Marlborough,
                        Wormser, Kiely, Galef & Jacobs LLP, New
                        York, New York, for defendants-appellees-
                        cross-appellants.

FEINBERG, Circuit Judge:

        Plaintiff Joseph J. Giordano worked as the Chief Financial

Officer (CFO) of Thomson Industries, Inc. (hereafter "TII" or

"the company") from September 2000 to October 2002.  During that

period, while TII was in the process of selling itself to defendant Danaher Corporation ("Danaher"), Giordano made some inquiries as to whether he would receive some sort of payment for his role in the sale. Some at TII perceived his behavior as counterproductive, and his employment was terminated. A little over a year later, Giordano brought this suit in the United States District Court for the Eastern District of New York. After a bench trial before Judge Joanna Seybert, the judge ruled in favor of TII and the two other defendants. We affirm.

## I. BACKGROUND

TII manufactured a number of products, including ball bearings. The company was founded by the father of defendant John Thomson, Jr.; at the time of the sale to Danaher, Thomson was TII's sole shareholder.

Giordano started working on TII matters while he was a partner at Coopers & Lybrand. In 1993, Giordano left that firm and began working for TII as a part-time consultant.

By 1999, it had become clear that TII was struggling financially. In early 2000, the company began discussions with investment bankers to consider options for turning the company around, since there were worries that the company would break some of the covenants in its lending agreements. The options included a sale of the company, a recapitalization and a

restructuring of its debt. TII eventually selected JPMorgan Chase ("JPMorgan") to represent it in these matters.

In 1999, as part of its turnaround efforts, the company hired Dr. Alex Beavers as its new CEO. Beavers, in turn, terminated Bartlett Polster, who was then the company's CFO. Polster had worked full time and was paid roughly $170,000 per year. In May 2000, Giordano was given the duties and title of the "acting CFO." In August 2000, Beavers asked Giordano to become the CFO, in part because (as Senior Corporate Vice President of Human Resources Patrick Mazzeo testified) it would look better to the people involved in the effort to sell or recapitalize the company to have an employee as CFO (as acting CFO, Giordano was technically still a consultant). Giordano told Beavers he would accept, but only if the role was part time and temporary. On this basis, Giordano became the company's CFO on September 1. He was paid a yearly salary of $250,000.

As indicated above, defendant Thomson eventually decided to sell the company to Danaher. Giordano assisted in the transaction by helping TII negotiate with its lenders. The company had defaulted on a loan payment and on a loan covenant. When the company defaulted, the lenders had the right to obtain a variety of extra payments. Giordano, working with Bruce Treen from JPMorgan, persuaded the lenders to waive their rights to those additional payments. This work was done mainly through

-3-

conference calls; Giordano testified that these took place roughly once a week (sometimes more, sometimes less). Giordano also initially fielded requests for due diligence information, but eventually he delegated this duty to a subordinate. Although Giordano claims that his work with the lenders went beyond what a CFO would normally be expected to do, Treen and Anthony Garvin (another JPMorgan banker) disagreed, opining that such work would be within the normal scope of a CFO's duties.

At trial, the deal participants disagreed regarding whether Giordano was, in general, a competent CFO. Treen testified that Giordano generally "fulfilled the role of CFO." By contrast, one Danaher employee testified that Giordano was essentially not doing his job and "not proficient in the financial matters of the business other than at the very basic level." Similarly, Richard Cummins, an advisor to defendant John Thomson, testified that Giordano "didn't function as a CFO" and failed to "straighten out the accounting department." Garvin stated that Giordano did all the work normally expected from a CFO but that he was "somewhat less involved than we would have liked to have seen for a company in its circumstances."

Defendants also note that, according to their calculations, Giordano worked roughly 6.2 days per month between December 2000 and October 2002. In addition, about one month before the transaction closed, Giordano was away on vacation.

-4-

At some point, Giordano became aware that Danaher was not planning on keeping him as an employee after the purchase. Thereafter, he made several inquiries regarding whether he would receive an additional payment, beyond his salary, for his role in the sale of the company. Some transaction participants thought he was threatening to block the sale if he was not paid the additional money; at trial Giordano denied making such threats. This process culminated in a dinner between Cummins and Giordano that took place on October 14, 2002, shortly before the transaction documents were signed. As Cummins remembered it, Giordano asked for $1 million or more, and Cummins said that Thomson would never approve a payment in that range. Cummins also testified that Giordano threatened to "torpedo the closing" by refusing to sign necessary documents if he was not paid. Cummins also testified that he then called the law firm working on TII's behalf to tell it that TII was going to have to fire Giordano. Giordano testified that he did not threaten to block the deal, and that Cummins agreed to recommend a payment of $600,000.

On October 16, 2002, Giordano went to a "pre-closing," at which various participants were signing papers for the sale to Danaher. While there, Giordano signed all of the documents put in front of him except a document under which he would have released all of his claims against Thomson, TII and Danaher.

Under the release, Giordano would receive a $15,230 severance payment. By the next day, he still had not signed the release.

On October 17, Thomson heard that Giordano had not signed the release. Thomson then decided that he had to terminate Giordano because the transaction could not be completed without a release and "in light of [Giordano's] prior actions and statements . . . he was going to torpedo the transaction." Thomson terminated Giordano that day via a faxed letter from Mazzeo. The parties to the sale then re-executed all of the documents previously signed by Giordano, negotiated a provision under which Thomson would indemnify Danaher for any claims made against it by Giordano and completed the sale.

In November 2003, Giordano brought this suit against defendants Danaher, Thomson and TII in the Eastern District claiming that (1) he is owed money under TII's severance plan, (2) he was fired in violation of the anti-retaliation provision of the Employee Retirement Income Security Act ("ERISA"), see ERISA § 510, 29 U.S.C. § 1140, and (3) his work during the deal unjustly enriched Thomson and TII.[1] In September 2005, after

[1]Giordano's other claims in the district court are not before us on appeal. With respect to the third claim on appeal, that Giordano was unjustly denied compensation for the "extra" tasks he allegedly performed beyond his normal CFO duties, we note that Giordano left ambiguous in his brief whether he was appealing the dismissal of his unjust enrichment claim alone or the dismissal of his contract-based claims as well. However, unjust enrichment is the only legal basis Giordano explicitly articulates when arguing the third point in his brief.

defendants moved for summary judgment and Giordano moved for partial summary judgment on his ERISA claim, the district court held that TII's severance plan constituted an "employee welfare benefit plan" subject to ERISA but denied the remainder of both motions, finding that there existed material issues of dispute for trial. Giordano v. Thomson, 438 F. Supp. 2d 35, 40-43 (E.D.N.Y. 2005). Then, in October 2006, the court held a bench trial. In May 2007, it dismissed all of Giordano's claims. Giordano v. Thomson, No. 03-cv-5672, 2007 U.S. Dist. LEXIS 39117 (E.D.N.Y. May 29, 2007). Specifically, the district court found that (1) Giordano's termination was not causually connected to any exercise of his rights under ERISA, (2) TII's denial of severance payments to Giordano was not "arbitrary and capricious" and (3) TII had not been unjustly enriched by Giordano's employment during the Danaher sale. Id.

Giordano then appealed, arguing that Judge Seybert should not have dismissed certain of his claims. Meanwhile, in a cross-

---

Moreover, TII expressly alleges in its brief that Giordano appeals only the unjust enrichment issue, and Giordano does not contest this characterization in his reply brief. Because Giordano fails to fully argue for reinstating his contract-based claims, we treat his third point on appeal as an argument for compensation based on unjust enrichment. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998).

appeal, the defendants contend that Judge Seybert erred in her conclusion that TII's severance plan is covered by ERISA.[2]

## II. ANALYSIS

We conclude that Giordano was not entitled to receive payments under TII's severance plan, that he was not terminated in violation of ERISA's anti-retaliation provision and that his unjust enrichment claim has no merit. Thus, we need not (and do not) decide whether the district judge was correct in her determination that TII's severance plan was an ERISA plan.

### A. Standard of Review

After a bench trial, this Court reviews a district court's factual findings for clear error and its legal conclusions de novo. See, e.g., Grace v. Corbis-Sygma, 487 F.3d 113, 118 (2d Cir. 2007).

### B. Giordano Is Not Entitled to Benefits Under Thomson's Severance Plan.

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a person to whom benefits are owed under an ERISA plan may bring a civil action to recover them. To prevail under § 502, a plaintiff must show that (1) the plan is covered by ERISA, see Guilbert v. Gardner, 480 F.3d 140, 145-46 (2d Cir. 2007), (2) plaintiff is a participant or beneficiary of the plan, see Rocco

---

[2]Giordano argues that defendants' cross-appeal is frivolous and that the defendants "arrogated" to themselves a filing extension. These arguments are without merit.

v. N.Y. State Teamsters Conference Pension & Ret. Fund, 281 F.3d 62, 70-71 (2d Cir. 2002), and (3) plaintiff was wrongfully denied severance pay owed under the plan, see Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1208 (2d Cir. 2002). Where an ERISA plan gives an administrator discretionary authority to "determine eligibility for benefits or to construe the terms of the plan" we review the administrator's decisions under the arbitrary and capricious standard. Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008) (internal quotation marks omitted). Where no such discretion is conferred, we review the administrator's decision de novo. See id.

The parties disagree regarding which standard of review should apply here, but we need not resolve the issue because Giordano's claim would fail under either standard. Judge Seybert confirmed the propriety of TII's decision to deny severance benefits to Giordano. See Giordano, 2007 U.S. Dist. LEXIS 39117, at *3-5. She cited three reasons for this conclusion. First, TII's deteriorating financial situation made it understandably reluctant to pay severance benefits. See id. at *4-5. Second, Giordano's predecessor received only eight weeks of severance payments even though he was a full-time employee (Giordano worked part time) and had worked at the company for 20 years (Giordano had been an employee for less than three years). See id. at *5.

Finally, the judge determined that the company offered severance benefits only to employees who were not terminated for cause; Giordano, she found, was terminated for cause--specifically, his attempt to "torpedo" the Danaher sale. See id. at *4, *6. After reviewing the record, we agree with Judge Seybert: Giordano was not entitled to severance payments.[3]

C.   Giordano's Retaliation Claim

ERISA § 510 provides that it is illegal to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of [such rights] . . . ." 29 U.S.C. § 1140 (internal citation omitted). To make out a prima facie case of retaliation under § 510, Giordano must show that (1) he was engaged in a protected activity, (2) TII was aware of that activity, (3) he suffered from an adverse employment decision and (4) there was a causal connection between the protected activity and the adverse

---

[3]Giordano also argues that TII violated ERISA's requirement that an ERISA plan participant whose claim has been denied be afforded a "full and fair review." 29 U.S.C. § 1133(2). We need not reach this claim since "the typical remedy" for violations of this provision is "remand for further administrative review," but remand is unnecessary where it would be futile. Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 630 (2d Cir. 2008). Remand would be fuitle here.

employment action. See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988). Moreover, Giordano must prove that TII had the specific intent to retaliate against him. See Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 66-67 (1st Cir. 2008); Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988). Specific intent is determined under the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Dister, 859 F.2d at 1111-13.

### 1. Giordano Was Not Fired for Refusing to Forfeit Severance Benefits Under the Plan

Giordano's first argument regarding retaliation is that he was terminated for failing to waive his claim for ERISA benefits when he declined to sign the release. Judge Seybert rejected this claim, finding that Giordano was terminated because his behavior during the Danaher deal was determined to be counterproductive. Giordano, 2007 U.S. Dist. LEXIS 39117, at *6-7. This finding is a reasonable one, particularly given our determination that Giordano was not, in fact, entitled to any severance benefits under the plan. We find no error (clear or otherwise) in the district court's findings on this issue.

### 2. ERISA § 510 Does Not Create a Cause of Action for Enforcing the Older Workers Benefit Protection Act

-11-

Giordano's second, and less conventional, argument appears to be related to the amount of time he was given to review the waiver of his claims against defendants and to 29 U.S.C. § 626(f), a provision of the Older Workers Benefit Protection Act (OWBPA). That provision provides that "[a]n individual may not waive any right or claim under [the Age Discrimination in Employment Act of 1967 (ADEA)] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). It then states that a waiver is not "knowing and voluntary" unless, among other things, the individual is given 21 days to review the waiver (a 45-day period applies in some cases). Id. § 626(f)(1)(F). Giordano appears to argue that TII is liable under ERISA § 510 for retaliating against him in response to his exercise of his OWBPA right to review the release for 21 days.

This argument is mistaken. ERISA § 510 does not create a cause of action for violations of OWBPA. ERISA § 510 prohibits only retaliation against a plaintiff who exercises a right derived from: (1) an employee benefits plan, (2) "this subchapter," (3) 29 U.S.C. § 1201 or (4) the Welfare and Pension Plans Disclosure Act. Id. § 1140. Because the OWBPA right to a 21-day review period under 29 U.S.C. § 626(f) does not fall within any of these four categories, there is no ERISA § 510 cause of action for a violation of § 626(f).

### D. Giordano's Unjust Enrichment Claims Are Without Merit

"Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 203 n.8 (2d Cir. 2004). Recovery on such a claim is "limited to the reasonable value of the services rendered by the plaintiff." Collins Tuttle & Co. v. Leucadia, Inc., 544 N.Y.S.2d 604, 605 (App. Div. 1989).

Here, it is clear that the reasonable value of the services provided by Giordano was not more than the actual amount he was paid. Giordano was paid $250,000 per year for part-time work, whereas his predecessor, who worked full time, was paid only $170,000. Moreover, according to some (but not all) deal participants, Giordano's performance as a CFO was somewhat disappointing. And while Giordano claims the work he did with TII's lenders was beyond the normal scope of a CFO's duties, none of the other deal participants who testified on the matter agreed. We cannot say that the judge erred in believing the latter group. Thus, Giordano's unjust enrichment claim is without merit.

### III. CONCLUSION

For the reasons stated above, we AFFIRM the district court's dismissal of Giordano's claims. Defendants' cross-appeal is

DISMISSED as moot; as noted, we express no opinion on whether TII's severance plan was an ERISA plan.