**Robert FELLOWS, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**CITIMORTGAGE, INC., Defendant.**

**No. 07 Civ. 2261(DLC).**

United States District Court, S.D. New York.

May 11, 2010.

Krishnan Shanker Chittur, Chittur & Associates, P.C., New York, NY, for Plaintiff.

David S. Versfelt, K & L Gates, LLP, New York, NY, R. Bruce Allensworth, Phoebe S. Winder, K & L Gates, LLP, Boston, MA, for Defendant.

## OPINION & ORDER

DENISE COTE, District Judge:

This action arises out of a mortgage servicer's refusal to permit early cancellation of private mortgage insurance ("PMI") despite a homeowner's request. Plaintiff Robert Fellows ("Fellows") brings this putative class action against his mortgage servicer, defendant CitiMortgage ("CitiMortgage"), for violation of the New York Deceptive Trade Practices Act ("DTPA"), breach of contract, and breach of the implied covenant of good faith and fair dealing under New York law. Fellows claims that CitiMortgage wrongfully refused to cancel the PMI on his mortgage and failed to provide him with adequate disclosures concerning his PMI cancella-

tion rights. In particular, Fellows argues that CitiMortgage's conduct violated Fannie Mae's Servicing Guide, the terms of which he contends were incorporated into his mortgage contract. CitiMortgage has moved to dismiss the amended complaint because Fellows' claims are preempted by federal law, and even if not preempted, the amended complaint fails to state a claim upon which relief can be granted.

CitiMortgage's motion to dismiss is granted. As discussed below, Fellows' DTPA claim is expressly preempted by the Homeowners Protection Act of 1998, 12 U.S.C. §§ 4901–4910 (2001), and Fellows does not allege that CitiMortgage violated any provision of the HPA. In addition, Fellows has failed to state a claim for breach of contract or for breach of the implied covenant. He has failed to plead that CitiMortgage violated any term of the mortgage or that the Servicing Guide can be deemed to be incorporated into the mortgage. As such, Fellows has made no showing of any right to early cancellation of the PMI on his mortgage.

## BACKGROUND

■ The following facts are taken from the amended complaint, or documents referenced therein,[1] and are assumed to be true for purposes of this Opinion.

### 1. The Mortgage

On or about September 3, 2003, Fellows purchased a residential property in New York for $225,000 (the "Property"). Fellows applied for a mortgage using a Uniform Residential Mortgage Application

---

1. On a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference ... and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). Accordingly, this Opinion relies on documents referenced in the amended complaint, including the Mortgage contract and Fannie Mae Servicing Guide, copies of which have been provided by the parties as exhibits in their motion papers.

(Form 1003), issued by Federal National Mortgage Association ("Fannie Mae"). Fellows obtained a $213,750 Fannie Mae-insured residential mortgage ("Mortgage") from HSBC Mortgage Corporation (USA) ("HSBC"), a Fannie Mae-approved mortgage lender.[2] Fellows alleges that HSBC thereafter sold the Mortgage to Fannie Mae, but remained the servicer.

Section 10 of the Mortgage contract addresses Fellows' obligations as to PMI.[3] It provides in pertinent part:

> If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, *[the Borrower] will pay the Mortgage Insurance premiums . . . until the requirement for Mortgage Insurance ends according to any written agreement between Lender and [Borrower] providing for such termination or until termination of Mortgage Insurance is required by Applicable Law.*[4] Lender may require [Borrower] to pay the premiums . . . in the manner

described in Section 3 of [the Mortgage].[5]

(Emphasis added.) Section 10 of the Mortgage further provides that the mortgage insurer may enter into agreements with other parties, including an affiliate of the Lender, to share or change its risk or to reduce losses.[6] It notes, however, that such reinsurance agreements "will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan." Further, such agreements

> will not affect the rights Borrower has— if any—regarding the [PMI] under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination."

2. Fellows alleges that the Fannie Mae form he signed is "used all over New York by Fannie Mae lenders" for Fannie Mae-insured residential mortgages. The first page of the Mortgage agreement contains the following notation: "New York—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT." In addition, each page of the Mortgage has a footer which reads: "Form 30331/01."

3. PMI is a property insurance line that protects lenders from mortgage default risk. PMI is used to facilitate "high-ratio" loans, that is, mortgages in which the loan-to-value ratio is typically more than 80 percent (*i.e.,* where the borrower makes a downpayment of less than 20 percent). PMI makes high-ratio lending possible by protecting lenders who make such loans from the risk of default and foreclosure. *See generally* Quintin Johnstone, *Private Mortgage Insurance,* 39 Wake Forest L.Rev. 783 (2004).

4. The Mortgage defines "Applicable Law" as "[a]ll controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions."

5. Section 3 of the Mortgage provides, in pertinent part, that the Borrower agreed to pay "to Lender all amounts necessary to pay for . . . any required Mortgage Insurance . . . as described in Section 10." The Borrower must "pay all of these amounts to Lender unless Lender tells [the Borrower], in writing, that [the Borrower] do[es] not have to do so, or unless Applicable Law requires otherwise."

6. If such an agreement provides that an affiliate of the Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is referred to in the industry as "captive reinsurance."

Consistent with Fannie Mae lending guidelines, HSBC required Fellows to obtain PMI because the loan-to-value ("LTV") ratio for the Mortgage was above 80 percent.[7] Fellows obtained PMI, for which he paid an annual premium of $1,667.28, in addition to his regular mortgage payments.

On or about April 7, 2004, HSBC assigned Fellows' Mortgage to defendant CitiMortgage for servicing. CitiMortgage, like HSBC, is a Fannie Mae-approved mortgage lender and has entered into a Mortgage Selling and Servicing Contract (the "Servicing Contract") with Fannie Mae. In May 2004, Fellows began making his monthly Mortgage and PMI payments to CitiMortgage.

**7.** LTV is typically calculated by dividing the outstanding value of the mortgage by the appraised value of the property. Thus, at the time Fellows purchased the Property, his Mortgage had a LTV ratio of approximately 95 percent ($213,750 divided by $225,000).

**8.** Citations to the Fannie Mae Servicing Guide in this Opinion refer to the 2006 version of the Servicing Guide, which was in effect at the time of the relevant events at issue here. *See* Fannie Mae Single Family Servicing Guide (Oct. 18, 2006), *available at* https://www.efanniemae.com/sf/guides/ssg (the "Servicing Guide").

**9.** The Mortgage Selling and Servicing Contract "establishes the basic legal relationship between a lender and Fannie Mae," including "the terms and conditions for servicing." *See* Servicing Guide, Pt. I, Ch. 2, § 201. The Mortgage Selling and Servicing Contract "incorporates by reference the terms of the ... Servicing Guide." *Id.* The Servicing Guide, in turn, provides:

All of [Fannie Mae's] lender communications [including the Servicing Guide] are instructions [Fannie Mae] provide[s] to enable a lender to perform (as an independent contractor) its obligations to Fannie Mae (as a secondary market investor) under the terms of the Mortgage Selling and Servicing Contract. *No borrower or other third party is intended to be a legal beneficiary of*

### 2. The Fannie Mae Servicing Guide [8]

Fellows alleges that by entering into a Servicing Contract with Fannie Mae, CitiMortgage is required to service his Mortgage in accordance with the Fannie Mae Servicing Guide.[9] The Servicing Guide provides that a borrower may request that a servicer cancel the PMI on a mortgage based on the current appraised value of the underlying property.[10] *See* Servicing Guide, Pt. II, Ch. 1, § 102.05. "If the borrower's written request for cancellation includes all of the information necessary to reach a decision about the cancellation, the servicer should determine whether the [LTV] ratio of the mortgage meets [Fannie Mae's] eligibility criterion and whether the borrower has an acceptable payment record." *Id.*[11] If the servicer determines that

*the Mortgage Selling and Servicing Contract or to obtain any such rights or entitlements through our lender communications [including the Servicing Guide].*
*Id.* (emphasis added).

**10.** The Servicing Guide also permits a borrower to request cancellation of PMI based on the *original* property value. Upon request, a servicer must cancel PMI if the borrower has an acceptable payment record, the value of the property is not less than its value at origination, and the servicer is satisfied that the mortgage meets the applicable LTV ratio eligibility criterion. For mortgages closed on or after July 29, 1999 secured by a one-family principal residence or second home, the LTV ratio eligibility criterion is met on the date that the mortgage balance is first scheduled to reach 80 percent of original value of the property, or the date that the mortgage balance actually reaches 80 percent. *See* Servicing Guide, Pt. II, Ch. 1, § 102.04.

**11.** The Servicing Guide defines "acceptable payment record" as follows:

A borrower has an acceptable payment record if he or she is current at the time the cancellation is requested (which means that the mortgage payment due for the month preceding the date of the cancellation request and all outstanding late charges must have been paid), has had no payment 30

the requirements have been met, the "servicer *must* cancel the [PMI]." *Id.* (emphasis added).

To calculate the LTV ratio, a servicer must divide the outstanding balance on the mortgage by the "current appraised value" of the property. *Id.* To determine the current appraised value, "the servicer must select an appraiser, order a new appraisal ..., and receive the results of the appraisal." *Id.* The servicer may charge the borrower for the cost of the appraisal. *Id.* For a first mortgage secured by a one-family principal residence or second home, the LTV ratio must be 75 percent or less if the mortgage is between two and five years old, and 80 percent if the mortgage is more than five years old. *Id.*

The Servicing Guide states that PMI "generally cannot be canceled for any mortgage that has been seasoned for fewer than two years." *Id.*[12] If, however, "a borrower who is the original borrower on the mortgage has made property improvements since the mortgage was originated and the property value has increased as a result of the improvements, [Fannie Mae] will waive the minimum two-year seasoning requirement." *Id.* If the two-year seasoning requirement is waived, the LTV ratio for the mortgage must be 75 percent or less in order for PMI to be cancelled. *Id.*

If the requirements for cancellation based on the current appraised value of the property are not satisfied, the servicer must notify the borrower that the request for cancellation has been denied and provide the grounds for the denial. *Id.* This

notice must be sent to the borrower within 30 days after the later of (1) the date on which the servicer received the borrower's request for cancellation, or (2) the date on which the servicer received the appraisal. *Id.*

### 3. Fellows' Attempts to Cancel PMI

After it began servicing the Mortgage, CitiMortgage sent Fellows annual notices concerning PMI cancellation rights. Fellows alleges that these notices did not inform him that he could seek cancellation of PMI based on the current *appraised* property value after the Mortgage was two years old, as permitted by the Servicing Guide. Nor did the annual notices inform Fellows that he could seek cancellation before the Mortgage was two years old if structural improvements were made that increased the property value.

In March 2005, Fellows requested that CitiMortgage cancel the PMI on his Mortgage as of September 2005, when the Mortgage was scheduled to become two years old. In a letter dated March 30, 2005, CitiMortgage advised Fellows that he could request a review of his account once the principal balance on his Mortgage fell below 80 percent of the original value of the Property (*i.e.*, when the Mortgage was reduced to $180,000 or less). The letter further advised Fellows that there could be no payment defaults within twelve months of the request for cancellation, and that the Property must remain owner-occupied.

---

days or more past due in the 12 months preceding the date that the mortgage insurance will be canceled, and has had no payment 60 days or more past due in the 24–month period preceding that date. *See* Servicing Guide, Pt. II, Ch. 1, § 102.05. In the event that the two-year seasoning requirement is waived because structural improvements resulted in an increase in proper-

ty value, the Servicing Guide provides that the borrower's payment history requirement will be limited to "the length of time that has elapsed since the mortgage was originated." *Id.*

12. "Seasoning" refers to the aging of a mortgage expressed as elapsed time since origination.

In a second letter dated March 30, 2005, CitiMortgage denied Fellows' request for cancellation on the grounds that he did not have a minimum two-year payment history and that an appraisal by a CitiMortgage-approved appraiser, ordered by its appraisal department, would be required to verify a 75 percent or lower LTV ratio for his Mortgage. The letter advised Fellows that he would be responsible for paying the appraisal fee.

Fellows alleges that CitiMortgage's representatives subsequently informed him that the two-year payment history must be calculated not from the date of the origination of the Mortgage, but from the date that CitiMortgage began servicing the Mortgage. Fellows claims that he has always been, and continues to be, current in his monthly payments under the Mortgage. Fellows objected to CitiMortgage's refusal to cancel the PMI on his Mortgage, and asked that CitiMortgage calculate the two-year payment history from the date of origination. Fellows also obtained a new appraisal of his Property from HSBC. The written appraisal, dated April 15, 2005, valued the Property at $340,000.

In a letter dated May 27, 2005, CitiMortgage responded to Fellows' objection. The letter states: "Normally, a two (2) year payment history is required before ordering a current CitiMortgage, Inc. approved appraisal of your property to verify a 75% [LTV] ratio." CitiMortgage advised Fellows, however, that he could request an exception to the two-year payment history requirement by submitting a detailed list of all "structural improvements" that had been made to the Property since origination, excluding repairs or maintenance items, along with evidence of the cost of such improvements. If CitiMortgage's underwriting department agreed to allow an appraisal to be ordered, information on how to obtain the new appraisal would be provided to Fellows. The letter advised that the appraisal would only take into consideration the improvements made to the Property, not normal appreciation.

Fellows sent a copy of the April 2005 appraisal of his Property to CitiMortgage and again requested cancellation of the PMI on his Mortgage as of September 2005. By letter dated August 8, 2005, CitiMortgage rejected Fellows' request. The letter states that because the Mortgage was less than two years old, in order to cancel the PMI based on the current appraised property value, structural improvements must have been made that "substantially increased" the property value. CitiMortgage requested that Fellows provide an itemization of improvements that had been made to the Property and the estimated value of each improvement.

CitiMortgage continued to bill and collect PMI premium payments from Fellows, including after the Mortgage became two years old in September 2005. In January 2007, Fellows reiterated his request that CitiMortgage cancel the PMI on the Mortgage. CitiMortgage purportedly acknowledged that PMI cancellation was governed by the Servicing Guide and advised Fellows that once a mortgage was two years old, PMI could be cancelled upon evidence of the current appraised property value.

4. This Lawsuit and Fellows' Final Request for Cancellation

On February 15, 2007, Fellows commenced this putative class action in New York state court. On March 16, CitiMortgage filed a notice of removal to federal court. The notice of removal indicated that Fellows' claims required resolution of substantial questions of federal law in dispute between the parties, namely the interpretation and application of the Homeowners Protection Act of 1998 ("HPA"), Pub.L. 105–216, 112 Stat. 897 (codified as amended at 12 U.S.C. §§ 4901–4910

(2001)), which CitiMortgage argued governs its obligations as to PMI cancellation.

On May 4, 2007, in response to another written request from Fellows to cancel the PMI on his Mortgage,[13] counsel for Citi-Mortgage wrote to Fellows' counsel to inform him that Fellows' cancellation request had been denied. The letter stated that pursuant to certain provisions of the HPA, 12 U.S.C. §§ 4901(2) and 4902, Fellows could request cancellation of the PMI when the principal balance of the mortgage is 80 percent of the *original value* of the Property. Because the LTV ratio based on the original value of the Property was still higher than 80 percent, Fellows had no right to obtain cancellation of PMI under the HPA. The letter acknowledged that even if the cancellation requirements in the Servicing Guide were applicable— which CitiMortgage contended were not— Fellows' Mortgage would still not be eligible for cancellation of PMI. The Servicing Guide permits a borrower to request cancellation of PMI on a mortgage that is between two and five years old when the LTV ratio is 75 percent based on the *current appraised value* of the Property. Since the principal balance of Fellows' Mortgage was still 85 percent of the Property value based on a "recent appraisal valuing the property at $240,000," the May 4, 2007 letter concluded that Fellows was ineligible for PMI cancellation.

On June 8, 2007, CitiMortgage filed a motion to dismiss the complaint, which became fully submitted on July 30, 2007. On June 5, 2009, the case was transferred to this Court while the motion to dismiss was still pending. At a conference with the parties on July 24, the Court *sua*

*sponte* raised the issue of subject matter jurisdiction, and the parties were directed to brief that issue. Fellows was granted leave to amend his complaint, but was warned that he would not be permitted any further opportunities to amend.

On July 31, 2009, Fellows filed an amended complaint. Count One of the amended complaint alleges that CitiMortgage's billing of Mr. Fellows for PMI premiums was "misleading and deceptive" in violation of the DTPA, N.Y. Gen. Bus. L. § 349 (McKinney 2004). Fellows' DTPA claim is premised on allegations that: (1) CitiMortgage required him to continue to pay PMI premiums even after the principal balance outstanding on his Mortgage dropped below the requirements for cancellation under the Servicing Guide; (2) CitiMortgage failed to inform Fellows at the time his mortgage was about to become two years old of his right to cancel PMI based on the current value of the Property; (3) CitiMortgage's practices and policy prevented any possibility that PMI could be cancelled on the second anniversary of the origination of the Mortgage; (4) CitiMortgage's practices and policy of using the date that it began servicing a mortgage, rather than the origination date, for purposes of determining Fellows' eligibility for cancellation of PMI were "unfair, deceptive, and illegal"; and (5) CitiMortgage deliberately undervalued the Property in order to avoid canceling the PMI.

Count Two of the amended complaint alleges that CitiMortgage's refusal to cancel the PMI was a breach of the Servicing Guide, which Fellows contends is incorporated into the Mortgage. Alternatively, Fellows claims that he is an intended

---

**13.** The amended complaint does not indicate the date on which Fellows made this last request to cancel his PMI. It states only that "Mr. Fellows once again wrote to [CitiMortgage] requesting cancellation of the PMI." CitiMortgage's response, which is dated May 4, 2007, indicates that Fellows had "recently requested cancellation." It thus appears that Fellows' last written cancellation request was made sometime after the filing of the original complaint on February 15, 2007.

third-party beneficiary of the Servicing Contract between CitiMortgage and Fannie Mae. Count Two further alleges that CitiMortgage's failure to inform Fellows of his right to cancel, and its refusal to cancel, the PMI on the second anniversary of the origination of the Mortgage constituted a breach of the implied covenant of good faith and fair dealing.

The amended complaint expanded the geographic scope of the putative class from a New York class to a nationwide class. By Order dated August 7, 2009, CitiMortgage's June 8, 2007 motion to dismiss was denied without prejudice to renewal in the event that the Court found that subject matter jurisdiction existed. On August 14, CitiMortgage filed a motion asking the Court to exercise subject matter jurisdiction over the action based on: (1) federal question jurisdiction under 28 U.S.C. § 1331; and (2) diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) (2005). By Order dated September 25, subject matter jurisdiction was found to exist under CAFA based on the allegations in the amended complaint.[14] On November 2, CitiMortgage filed the instant motion to dismiss the amended complaint. The motion became fully submitted on December 30.

## DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). This rule "does not require 'detailed factual allegations,'" *id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.*, 517 F.3d 104 (2d Cir.2008) (citation omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955) (citation omitted); *see also S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir.2009). Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950.

CitiMortgage contends that Fellows' DTPA and breach of contract claims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because they are expressly preempted by the HPA.[15] Even if Fellows' claims escape preemption, however, CitiMortgage argues that they must be dismissed for failure to state a claim. Prior to addressing CitiMortgage's preemption

14. Because jurisdiction under CAFA was found to exist, the existence of jurisdiction under 28 U.S.C. § 1331 was not addressed.

15. CitiMortgage separately argues that Fellows' DTPA claim is preempted by Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461 *et seq.*, and the regulations promulgated thereunder, 12 C.F.R. § 560.2 (2009), and by National Bank Act ("NBA"), 12 U.S.C. § 24 *et seq.*, and the regulations promulgated thereunder, 12 C.F.R. § 34.4 (2009). Because Fellows' DTPA claim is expressly preempted by the HPA, it is unnecessary to consider these alternative bases for preemption.

argument, a brief overview of the HPA is in order.

### 1. The Homeowners Protection Act of 1998

In 1998, Congress enacted the HPA to "establish Federal guidelines for disclosure and termination of private mortgage insurance (PMI)." H.R.Rep. No. 105–55, at 4 (1997). Although PMI was found to "play[ ] an important role in the mortgage industry by allowing low-income borrowers or borrowers with little cash greater access to home ownership," *id.* at 5, Congress determined that "homeowners are not always informed when PMI is required, and if it is, how it can be terminated." *Id.* at 6; *see also* S. Rep. 105–129, at 2–3 (1997), *as reprinted in* 1998 U.S.C.C.A.N. 313, 314–15. Legislation was therefore needed "to establish Federal standards for disclosure and termination of PMI so that borrowers do not pay for insurance after all parties in the mortgage process agree that such insurance is no longer necessary." H.R.Rep. No. 105–55, at 6.[16] The HPA "creates a national standard for cancellation that is clear and simple for consumers to understand." 143 Cong. Rec. S12410, S12414 (daily ed. Nov. 9, 1997) (statement of Sen. Faircloth).

The HPA extends to any residential mortgage loan transaction consummated on or after July 29, 1999, on a single-family dwelling that is the primary residence of the mortgagor. 12 U.S.C. § 4901(14), (15). Under the HPA, PMI must be terminated by the servicer on the date when the principal balance of the loan is first scheduled to reach 78 percent of the "original value"[17] of the property securing the loan (the "termination date")[18], provided that the mortgagor is current on the payments required under the mortgage. *Id.* §§ 4901(18), 4902(b).[19] The HPA also provides that a mortgagor may request cancellation of PMI on, or at any time after, the date when the principal balance on the mortgage declines to 80 percent of the original value of the property (the "cancellation date"). *Id.* §§ 4901(2), 4902(a). In order for cancellation to occur, the mortgagor must: (1) submit a request for cancellation in writing to the servicer; (2) have a "good payment history"[20]; (3) be current

---

**16.** At the time the HPA was enacted, only eight states had PMI cancellation and disclosure laws on their books: California, Minnesota, New York, Colorado, Connecticut, Maryland, Massachusetts and Missouri. *See* 144 Cong. Rec. H5428, H5437 (daily ed. July 14, 1998) (statement of Rep. LaFalce).

**17.** "The term 'original value,' with respect to a residential mortgage, means the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage was consummated." 12 U.S.C. § 4901(12).

**18.** The termination date is based solely on the amortization schedule for the mortgage, irrespective of the actual outstanding balance on that date. *See id.* § 4901(18).

**19.** If the mortgagor is not current on the termination date, then the PMI must be cancelled on the first day of the first month after the date that the mortgagor becomes current on the payments required by the terms of the mortgage. *Id.* § 4902(b)(2).

**20.** Under the HPA, "good payment history" means that the mortgagor has not:

(A) made a mortgage payment that was 60 days or longer past due during the 12–month period beginning 24 months before the later of (i) the date on which the mortgage reaches the cancellation date, or (ii) the date that the mortgagor submits a request for cancellation under section 4902(a)(1) of this title; or

(B) made a mortgage payment that was 30 days or longer past due during the 12–month period preceding the later of (i) the date on which the mortgage reaches the cancellation date, or (ii) the date that the mortgagor submits a request for cancellation under section 4902(a)(1) of this title. *Id.* § 4901(4).

on the payments required under the mortgage; and (4) satisfy any requirement of the mortgage holder for (i) evidence that the value of the property securing the mortgage has not declined below the original value and (ii) certification that the equity of the mortgagor is unencumbered by a subordinate lien. *Id.* § 4902(a)(1)-(4). The HPA provides that in no case may PMI be required after the midpoint of the amortization period of the loan is reached, provided that the mortgagor is current on the payments required under the mortgage. *Id.* § 4902(c). After termination or cancellation of PMI, no payments of premiums may be required from the mortgagor, *id.* § 4902(e), and any unearned premiums paid by the mortgagor must be returned. *Id.* § 4902(f).[21]

To assure that mortgagors are informed of their cancellation and termination rights, the HPA requires lenders and servicers of mortgages insured by PMI to provide certain disclosures.[22] At the time the mortgage is consummated, the mortgagee must provide the mortgagor with an initial amortization schedule and a written notice indicating: (1) the date on which the mortgagor may request cancellation of PMI based solely on the initial amortization schedule; (2) that the mortgagor may request cancellation earlier than provided for in the initial amortization schedule based on actual payments; (3) the date on which PMI will automatically be terminated; and (4) any applicable exemptions to the right to cancellation and automatic termination. *Id.* § 4903(a)(1)(A).[23] Thereafter, the servicer must provide on an annual basis a written disclosure which describes the mortgagor's cancellation and termination rights. *Id.* § 4903(a)(3). Within thirty days after the cancellation or termination date, the servicer must notify the mortgagor in writing that the PMI has been terminated, that the mortgagor no longer has PMI, and that no further premiums shall be due or payable. *Id.* § 4904(a).[24]

To ensure compliance with these termination and disclosure requirements, the HPA provides for enforcement by various federal banking regulatory agencies. *See id.* § 4909. The HPA also grants a civil cause of action to any mortgagor whose rights under the HPA are violated by a servicer, mortgagee, or mortgage insurer. *See id.* § 4907(a). In the case of a civil action by an individual, a mortgagor may recover actual damages, statutory damages not to exceed $2,000, reasonable attorneys' fees, and costs. *Id.*[25] The HPA imposes a two-year statute of limitations on such actions. *Id.* § 4907(b).

---

21. The HPA's provisions do not apply to certain high-risk loans, *see id.* § 4902(g), or to PMI paid for by the lender rather than the borrower. *See id.* § 4905(b).

22. These disclosure requirements apply to residential mortgages consummated on or after July 29, 1999. *Id.* § 4903(a)(4).

23. These disclosure requirements are applicable for fixed rate mortgages; the disclosure requirements for adjustable rate mortgages are substantially similar. *See id.* § 4903(a)(1)(B). Separate disclosure requirements apply to certain high-risk loans. *See id.* § 4903(a)(2).

24. If the servicer determines that the mortgage did not meet the requirements for termination or cancellation, the servicer must notify the mortgagor of the grounds relied on to make such a determination. *See id.* § 4904(b).

25. The HPA limits the amount of damages that may be recovered in a class action depending on whether the liable party is subject to regulation under 12 U.S.C. § 4909. *See id.* § 4907(a)(1), (2).

Lastly, and most relevant to the present discussion, the HPA includes a preemption provision. It provides:

> With respect to any residential mortgage or residential mortgage transaction consummated after [July 29, 1999] and except as provided in paragraph (2) [concerning protected state laws], the provisions of this chapter shall supersede any provisions of the law of any State *relating to* requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions, *cancellation* or automatic termination of such private mortgage insurance, *any disclosure* of information addressed by this chapter, and any other matter specifically addressed by this chapter.

*Id.* § 4908(a)(1) (emphasis added). Exempted from preemption are so-called "protected State laws," except to the extent that such laws are inconsistent with any provision of the HPA. *Id.* § 4908(a)(2).[26] The HPA also contains a "savings clause" that provides that the HPA's preemption provision should not be construed to preclude private agreements "between a mortgagor and the holder of the mortgage" that provide for cancellation or termination of PMI prior to the cancellation or termination dates required under the HPA. *Id.* § 4910(b).[27]

## 2. Preemption Jurisprudence and the HPA

▐▐▐ CitiMortgage contends that Fellows' state-law claims are expressly preempted by the HPA's preemption provision. "Under the Supremacy Clause of the United States Constitution, state laws that conflict with federal law are without effect, and are preempted." *N.Y. Rest. Ass'n v. N.Y. City Bd. of Health*, 556 F.3d 114, 123 (2d Cir.2009) (citation omitted); *see also Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir.2009). "The purpose of Congress is the ultimate touchstone in every pre-emption case." *N.Y. Rest. Ass'n*, 556 F.3d at 123 (citing *Altria Group, Inc. v. Good*, ─── U.S. ───, ───, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008)). A court must begin its preemption analysis "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *N.Y. Rest. Ass'n*, 556 F.3d at 123 (citation omitted). "Congressional intent primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Island Park*, 559 F.3d at 101 (citing *Altria Group*, 129 S.Ct. at 543).

▐▐▐ Pre-emption may be express or implied. "Express preemption arises when a federal statute expressly directs

---

**26.** The HPA defines "protected State law" to mean any state law concerning "requirements relating to [PMI]" for residential mortgages that was enacted no later than July 29, 2000, by a state that had in effect, on or before January 2, 1998, a similar law concerning PMI requirements. *Id.* § 4908(a)(2)(C). Such laws are not considered inconsistent with the HPA if they (1) require termination of PMI at a date earlier, or when a mortgage principal balance is achieved that is higher, than provided under the HPA; or (2) require disclosure of more information, or more often or at a date earlier, than required under the HPA. *Id.* § 4908(a)(2)(B).

**27.** The savings clause provides in full:

> Nothing in this chapter shall be construed to preclude cancellation or termination, by agreement between a mortgagor and the holder of the mortgage, of a requirement for private mortgage insurance in connection with a residential mortgage transaction before the cancellation or termination date established by this chapter for the mortgage.

12 U.S.C. § 4910(b).

that state law be ousted." *Island Park,* 559 F.3d at 101. "In the absence of an express directive from Congress, pre-emption may be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* (citation omitted). As the Supreme Court has said:

When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion) (citation omitted). "The Supreme Court has cautioned, however, that the presence of an express preemption clause in a federal statute does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Island Park,* 559 F.3d at 101 (citing *Altria Group,* 129 S.Ct. at 543).

The HPA contains an express preemption provision. It provides that the HPA "shall supersede any provisions of the law of any State *relating to* requirements" for, *inter alia,* "*cancellation* or automatic termination of such [PMI]" and "any *disclosure* of information addressed by [the HPA]." 12 U.S.C. § 4908(a)(1) (emphasis added). No federal court has interpreted the HPA's preemption provision.

▮ The HPA's use of the words "relating to" in its preemption provision is key. "Congress's use of the phrase 'relating to' in federal legislation generally signals its expansive intent." *Mizrahi v. Gonzales,* 492 F.3d 156, 159 (2d Cir.2007) (citation omitted). Federal courts have construed the words "relating to" in the preemption provisions of other federal statutes, most notably the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1144(a), and the Airline Deregulation Act of 1978 ("ADA"), 49 U.S.C. § 41713(b)(1). Judicial interpretations of the preemption provisions in ERISA and the ADA are therefore helpful in construing the HPA's preemption provision. *See Rowe v. N.H. Motor Transp. Ass'n,* 552 U.S. 364, 370, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) ("[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well." (citation omitted)).

▮ ERISA's preemption provision provides that "the provisions of [ERISA] shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). In *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) ("*Travelers*"), the Supreme Court noted that ERISA's preemption provision "is clearly expansive." *Id.* at 655, 115 S.Ct. 1671; *see also Paneccasio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 113 (2d Cir.2008). In interpreting ERISA's preemption provision, the Supreme Court has held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has *a connection with* or *reference to* such a plan." *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671 (citing *Shaw v. Delta Air Lines,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)) (emphasis added); *accord Paneccasio,* 532 F.3d at 114; *Hattem v. Schwarzenegger,* 449 F.3d 423, 428 (2d Cir.2006). "[A] state law may 'relate to' a benefit plan, and thereby be

preempted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). "Preemption is also not precluded simply because a state law is consistent with ERISA's substantive requirements." *Id.*

 Notwithstanding the breadth of ERISA's preemptive reach, the Supreme Court in *Travelers* held that the "related to" language did not modify the presumption that Congress did not intend to supplant state law. *See Hattem,* 449 F.3d at 428. The Supreme Court therefore began its analysis in *Travelers* with the assumption that "the historic police powers of the states were not to be superseded by ERISA unless that was the clear and manifest purpose of Congress." *Hattem,* 449 F.3d at 428 (citing *Travelers,* 514 U.S. at 655, 115 S.Ct. 1671). Accordingly, "[i]n determining whether a 'connection with' exists, [a court] look[s] to the objectives of the ERISA statute as a guide." *Hattem,* 449 F.3d at 429 (citing *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671); *see also Empire HealthChoice Assur., Inc. v. McVeigh,* 396 F.3d 136, 147 (2d Cir.2005) (*"Empire HealthChoice"*). "[P]reemption is not called for if the state law has only a tenuous, remote, or peripheral connection with covered plans." *Hattem,* 449 F.3d at 429 (citing *Travelers,* 514 U.S. at 661, 115 S.Ct. 1671). Similarly, with respect to the "reference to" prong, "[w]hile singling out ERISA plans for special treatment is considered a 'reference,' simply mentioning the word 'ERISA' is not." *Hattem,* 449 F.3d at 432 (citation omitted). Thus, where a state law "function[s] irrespective of the existence of an ERISA plan," it does not "impermissibly create a 'reference to' an ERISA plan." *Id.* at 433 (citation omitted).

The ADA's preemption provision also contains the words "related to," and has therefore been interpreted to have a similar, but not co-extensive, preemptive reach as ERISA. *See, e.g., Abdu–Brisson v. Delta Airlines, Inc.,* 128 F.3d 77, 81 (2d Cir.1997) (looking to ERISA cases for guidance in interpreting the ADA's preemption provision). The ADA provides, in pertinent part, that a state "may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). In *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), the Supreme Court relied on its ERISA cases to define the words "relating to" in the ADA preemption provision as "having a connection with, or reference to, airline 'rates, routes, or services.'" *Morales,* 504 U.S. at 384, 112 S.Ct. 2031. In *Rowe v. N.H. Motor Transp. Ass'n,* 552 U.S. 364, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008), the Supreme Court reiterated its conclusion from *Morales* in construing the preemption provision of the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c)(1), which is identical to that of the ADA. *Rowe,* 552 U.S. at 370, 128 S.Ct. 989; *see also Air Transp. Ass'n of Am., Inc. v. Cuomo,* 520 F.3d 218, 222 (2d Cir.2008) (per curiam) (*"Air Transp."*). With respect to the preemptive reach of the ADA, the Supreme Court determined:

(1) that "[s]tate enforcement actions *having a connection with, or reference to*" carrier "'rates, routes, or services'" are preempted"; (2) that such preemption may occur even if a state law's effect on rates, routes or services "is only indirect"; (3) that, in respect to preemption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation; and (4) that preemption occurs at least where state laws have a "significant im-

pact" related to Congress' deregulatory and preemption-related objectives. *Rowe*, 552 U.S. at 370–71, 128 S.Ct. 989 (citation omitted) (emphasis added).

▮▮▮▮▮ Ultimately, whether a particular state law is preempted by the ADA depends on whether the "state law actually interferes with the purposes of the federal statute." *Abdu–Brisson*, 128 F.3d at 82 (citing *Travelers*, 514 U.S. at 655, 115 S.Ct. 1671). "Congress's 'overarching goal' with regard to the ADA was helping to assure that transportation rates, routes, and services reflected maximum reliance on competitive market forces." *Air Transp.*, 520 F.3d at 222–23 (citation omitted). Given this goal, "the Supreme Court has repeatedly emphasized the breadth of the ADA's preemption provision." *Id.* at 222. Nevertheless, like ERISA's preemption provision, the ADA's preemption clause leaves "room for state actions 'too tenuous, remote, or peripheral to have pre-emptive effect.' " *Am. Airlines v. Wolens*, 513 U.S. 219, 224, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (quoting *Morales*, 504 U.S. at 390, 112 S.Ct. 2031); *see also Rowe*, 552 U.S. at 371, 128 S.Ct. 989; *Abdu–Brisson*, 128 F.3d at 81.

In light of the judicial interpretation of words "relating to" in the context of ERISA and the ADA, it is clear that the preemptive reach of the HPA is expansive. With the exception of "protected State laws," the HPA preempts all state laws that have "a connection with" or "reference to" requirements for, *inter alia,* cancellation of PMI and disclosure of information concerning PMI cancellation. *See* 12 U.S.C. § 4908(a)(1). The breadth of the HPA's preemption provision is confirmed by the statute's limited carve-out for "protected State laws." The HPA exempts from preemption only the laws of states which already had PMI-related laws on their books on or before January 2, 1998. *See id.* § 4908(a)(2)(C). Further, such

"protected State laws" are only exempted from preemption to the extent that they are not "inconsistent with any provision" of the HPA. *Id.* § 4908(a)(2)(A), (B).

The breadth of the HPA's preemption provision is also confirmed by the legislative history of the HPA. As noted above, Congress enacted the HPA to create a uniform national standard for PMI cancellation and automatic termination that would be easy for consumers to understand and simple to enforce. The Senate Report accompanying the bill that became the HPA, S. 318, acknowledged that the bill "contains a preemption provision, applicable . . . to mortgages entered into on or after the effective date of [the HPA]." S.Rep. No. 105–129, at 8–9, 1998 U.S.C.C.A.N. at 321. The Senate Report states that the "bill . . . provides *broad preemptive language* that will minimize compliance costs with respect to state laws." *Id.* at 9, 1998 U.S.C.C.A.N. at 321–22 (emphasis added). As such, the Senate Report noted that "[i]nvestors cannot require servicers to adhere to any other cancellation or termination guidelines than those outlined in [the HPA]." *Id.* The original House version of the bill, H.R. 607, would not have preempted state laws. *See* H.R.Rep. No. 105–55, at 5. Congress ultimately enacted the Senate version of the bill, however, which contained the preemption provision. Some members of the House were reluctant to agree to the preemption provision in the Senate bill, despite their ultimate support for the passage of the HPA. *See, e.g.,* 144 Cong. Rec. H5428, H5436 (daily ed. July 14, 1998) (statement of Rep. LaFalce) ("With the exception of a limited exemption for eight states, we preempt States from enacting stronger consumer protection legislation. This is offensive . . . ."); *id.* at H5437 ("I would have strongly preferred that the bill simply respect the rights of all states to enact stronger cancellation and disclosure

laws.... But the Senate would not agree to this approach."). Thus, the HPA's legislative history confirms that which is apparent from the plain meaning of its text: Congress intended for the scope of the HPA's preemption provision to be broad.

### 3. The HPA Preempts the DTPA Claim

■ Given the breadth of the HPA's preemption provision, as evidenced by its text, structure, and history, Fellows' DTPA claim is expressly preempted by the HPA. The DTPA prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York state]." N.Y. Gen. Bus. L. § 349(a). Fellows's DTPA claim is predicated on allegations that CitiMortgage failed to provide adequate disclosures concerning his cancellation rights and required the payment of PMI premiums even after his Mortgage met the requirements for cancellation under the Servicing Guide. Thus, Fellows attempts to use the New York DTPA to impose requirements for PMI cancellation and disclosure that are not required by the HPA. As invoked here, it is clear that Fellows' DTPA claim has "a connection with" requirements concerning PMI cancellation and disclosure. This connection is not "tenuous, remote, or peripheral," but rather direct and substantial. As such, Fellows' DTPA claim "relates to" requirements for "cancellation" of PMI and "disclosure of information" addressed by the HPA.

Permitting Fellows' DTPA claim to proceed would frustrate Congress's objective of creating of a uniform national standard for PMI cancellation and disclosure. With limited exceptions for protected state laws, Congress intended for the HPA to remove from the states' purview the regulation of requirements concerning PMI cancellation and disclosure. *See, e.g.,* S.Rep. No. 105–129, at 9, 1998 U.S.C.C.A.N. at 321 ("Investors cannot require servicers to adhere to any other cancellation or termination guidelines than those outlined in [the HPA]."). Fellows' DTPA claim would interfere significantly with this objective. *See, e.g., Air Transp.,* 520 F.3d at 223 (holding that service-related requirements imposed on air carriers by the New York "Passenger Bill of Rights" were preempted by the ADA because they would frustrate the ADA's objective of having such requirements determined by "competitive market forces"). Further, allowing mortgagors to use state consumer protection laws to impose requirements for PMI cancellation and disclosure that are inconsistent with the HPA could lead to the creation of a "patchwork" of PMI-related requirements among the states. *See id.* at 224; *see also Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. 478. Such an outcome would be "fundamentally at odds with the goal of uniformity that Congress sought to implement." *Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. 478.

Fellows' DTPA claim would also interfere with the civil enforcement mechanisms provided by Congress in the HPA. *See id.* (ERISA). The HPA provides that "[c]ompliance with the requirements imposed under [the HPA] shall be enforced" by federal banking regulators. 12 U.S.C. § 4909. In addition, the HPA expressly grants a private cause of action to mortgagors whose rights under the HPA are violated by any servicer, mortgagee, or mortgage insurer. *Id.* § 4907. This civil enforcement scheme is one of the "essential tools for accomplishing the stated purposes," *Pilot Life Inc. Co. v. Dedeaux,* 481 U.S. 41, 52, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), of the HPA. Allowing Fellows' DTPA claim to proceed would interfere with these civil enforcement mechanisms, thereby further undermining Congress's purpose in enacting the HPA.

Fellows argues that the HPA does not preempt his DTPA claim because the DTPA is a statute of general applicability and does not contain any explicit "reference to" PMI.[28] The fact that the DTPA does not specifically mention PMI does not alter the conclusion that Fellows' DTPA claim "relates to" requirements for PMI cancellation and disclosure. Fellows' DTPA claim is ultimately predicated on New York statutory duties that would impose requirements different from federal requirements for PMI cancellation and disclosure. Moreover, the preemption provisions of ERISA and the ADA, which closely resemble that of the HPA, have been interpreted to preempt claims brought under state deceptive trade practices statutes. *See, e.g., Wolens*, 513 U.S. at 228, 115 S.Ct. 817 (holding that the ADA preempts claims under the Illinois Consumer Fraud and Deceptive Business Practices Act); *Paneccasio*, 532 F.3d at 114 (holding that ERISA preempts a claim under the Connecticut Unfair Trade Practices Act); *Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir.1998) (per curiam) (same); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F.Supp.2d 299, 315 (E.D.N.Y.2005) ("*JetBlue*") (holding that privacy-related claim brought under the New York DTPA "fits squarely" within the range of state law actions preempted by the ADA). Because Fellows' DTPA is expressly preempted by the HPA, it shall be dismissed.

**4. The HPA Does Not Preempt the Breach of Contract Claim**

 In its preemption jurisprudence, the Supreme Court generally draws a distinction between a "contractual commitment voluntarily undertaken" and a "requirement ... imposed under State law." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir.2009) (citing *Cipollone*, 505 U.S. at 526, 112 S.Ct. 2608). In *Cipollone*, the Supreme Court reasoned that "common understanding dictates that a contractual requirement, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the contracting party upon itself." *Cipollone*, 505 U.S. at 526 n. 24, 112 S.Ct. 2608; *see also Wolens*, 513 U.S. at 228, 115 S.Ct. 817; *Empire HealthChoice*, 396 F.3d at 144; *JetBlue*, 379 F.Supp.2d at 316–18.[29]

Fellows' breach of contract claim is not preempted by the HPA. Unlike the DTPA claim, the breach of contract claim is not predicated on any violation of state-imposed obligations, but rather on CitiMortgage's purported self-imposed undertakings under the Mortgage. As the Supreme Court reasoned in *Wolens*, this distinction between "what the State dictates" and what the mortgagor or servicer "itself undertakes," "confines courts, in breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Wolens*, 513 U.S. at 233, 115 S.Ct. 817. Unlike the DTPA claim, Fellows' breach of contract

---

**28.** Fellows does not argue, nor could he, that the DTPA qualifies as a "protected State law" under the HPA, *see* 12 U.S.C. § 4908(a)(2), and is therefore exempt from preemption under the HPA.

**29.** Unlike the ADA, ERISA's preemption provision has been interpreted to extend to breach of contract claims that "relate to" an employee benefit plan. *See, e.g., Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir.2003). In *Wolens*, the Supreme Court justified the broader preemptive reach of ERISA's preemption provision based on the fact that, unlike the ADA, ERISA contains "a comprehensive scheme ... designed to promote prompt and fair claims settlement." *Wolens*, 513 U.S. at 232, 115 S.Ct. 817 (citation omitted); *see also Ingersoll–Rand*, 498 U.S. at 143–145, 111 S.Ct. 478; *Empire HealthChoice*, 396 F.3d at 147–48.

claim does not run afoul of the HPA's preemption provision or frustrate its purpose.

Analogizing to ERISA preemption cases, CitiMortgage argues that the HPA should be interpreted to preempt the breach of contract claim. CitiMortgage's reliance on cases extending ERISA's preemptive reach to breach of contract claims is understandable, but misplaced. Like ERISA, the HPA provides for a private cause of action for violations of requirements imposed by the HPA, *see* 12 U.S.C. § 4907, and might therefore be interpreted to displace certain common law contract claims.[30] In this case, however, Fellows' breach of contract claim is not based on allegations that CitiMortgage violated the requirements for PMI cancellation and disclosure under the HPA, which would give rise to a civil action under § 4907. Rather, Fellows' breach of contract claim is predicated solely on CitiMortgage's purported violations of PMI cancellation and disclosure requirements imposed by the Servicing Guide, which Fellows alleges is incorporated into the Mortgage contract. Moreover, unlike ERISA, the HPA contains a savings clause which explicitly exempts from preemption any "agreement between a mortgagor and the holder of the mortgage" which provides for the "cancellation or termination ... of a requirement for [PMI] ... before the cancellation or termination date established by [the HPA]." 12 U.S.C. § 4910(b). This provision indicates that Congress did not intend for the HPA to prevent mortgagors from bringing a breach of contract claim to vindicate their contractual right under an agreement with the holder of their mortgage to cancel PMI earlier than

allowed by the HPA. Since that is precisely what Fellows seeks to do here, his breach of contract claim survives preemption by the HPA.

5. Failure to State a Claim for Breach of Contract

 Although Fellows' breach of contract claim is not preempted by the HPA, the amended complaint nevertheless fails to state a claim for breach of contract. Under New York law, "[t]o establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir.2004). "It is well settled that a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 884 N.Y.S.2d 211, 912 N.E.2d 43, 47 (2009); *accord JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir.2009). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Capital Partners*, 884 N.Y.S.2d 211, 912 N.E.2d at 47.

Section 10 of the Mortgage unambiguously states that Fellows must "pay the Mortgage Insurance premiums ... until the requirement for [PMI] ends according to *any written agreement* between Lender and [Borrower] providing for such termination or until termination of [PMI] is *required by Applicable Law*." (Emphasis added). Fellows does not allege that he

**30.** Fellows' breach of contract claim seeks to vindicate his purported contractual rights under the Mortgage to early cancellation of PMI and to more extensive disclosure than that which is required by the HPA. As such, this

case does not present the question of whether a breach of contract claim based solely on alleged violations of the requirements for PMI cancellation and disclosure under the HPA would survive preemption.

entered into a written agreement with CitiMortgage providing for termination of PMI, or that termination of PMI was required under any applicable law, including the HPA or N.Y. Ins. L. § 6503.[31] Likewise, Fellows points to no provision of the Mortgage contract that requires any disclosure of PMI cancellation rights to which he claims he was entitled. Rather, Fellows' breach of contract claim is predicated solely on his contention that CitiMortgage disregarded its obligations under the Fannie Mae Servicing Guide. Because the terms of the Servicing Guide are not part of the Mortgage contract, Fellows' claim is unavailing.

▬▬▬ Under New York law, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990). When a contract lacks an express "integration clause," however, "the district court must determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." *Starter Corp. v. Converse, Inc.,* 170 F.3d 286, 295 (2d Cir. 1999) (citation omitted). In such cases, a court must examine whether "the parties would ordinarily be expected to embody the agreement in a writing based upon the type of transaction involved, the scope of the written contract and the content of any other agreements." *Id.* (citation omitted).

▬▬ While the Mortgage does not contain an express integration clause, it is evident based on the text of the agreement and the surrounding circumstances that the parties intended the Mortgage to be an integrated contract. Indeed, New York

law requires that all mortgages be committed to writing. *See* N.Y. Gen. Obl. L. § 5–703(4) (McKinney 2001). Accordingly, the Mortgage contract must be enforced "according to its terms." Because the Servicing Guide is not mentioned, referenced, or otherwise incorporated within the "four corners" of the Mortgage, it cannot be considered a part of the contract between Fellows and CitiMortgage. The Servicing Guide therefore provides no basis for Fellows' breach of contract claim.

Fellows' principal arguments for why the Servicing Guide is incorporated into the Mortgage contract are that (1) CitiMortgage is a party to a Servicing Contract with Fannie Mae which obligates CitiMortgage to abide by the terms of the Servicing Guide; (2) that HSBC used Fannie Mae's standard form for Fellows' Mortgage; and (3) that HSBC told him that his Mortgage was a "Fannie Mae Mortgage." Because the Mortgage is an integrated agreement, however, such extrinsic evidence cannot be used to alter the terms of the contract. In any event, none of these allegations is sufficient to support a finding that the Servicing Guide was incorporated into the Mortgage contract.

Fellows is not a party to the Servicing Contract between Fannie Mae and CitiMortgage. As such, only Fannie Mae has any right under the contract to enforce CitiMortgage's obligations with respect to the Servicing Guide. Further, allegations that HSBC was a Fannie Mae lender, used a standard Fannie Mae form, or referred to the Mortgage as a "Fannie Mae mortgage," do not justify any reasonable expectation that the Servicing Guide would be incorporated into the Mortgage contract. Accordingly, CitiMortgage's purported violations of the Servicing Guide do not give

---

**31.** The Mortgage contract itself confirms that the HPA sets the standard for disclosure and cancellation of PMI. Section 10 of the Mortgage recognizes "rights Borrower has ... *un-*der the [HPA]* ... includ[ing] the right (a) to receive certain *disclosures,* (b) to request and obtain *cancellation* of the Mortgage Insurance...." (Emphasis added.)

rise to a breach of contract claim by Fellows.

▬ In the alternative, Fellows argues that he is a third-party beneficiary of the Servicing Contract between Fannie Mae and CitiMortgage. This assertion is incorrect as a matter of law. "A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that clearly evidence an intent to permit enforcement by the third party in question." *Premium Mortg.*, 583 F.3d at 108 (citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208 (1985)); *see also Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 251 (2d Cir.2006) ("It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." (citation omitted)). " 'A party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.' " *Madeira*, 469 F.3d at 251 (quoting *State of Cal. Pub. Employees' Ret. Sys. v.*

*Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S.2d 256, 741 N.E.2d 101, 104 (2000)).

While the existence of a valid agreement between CitiMortgage and Fannie Mae is undisputed, Fellows points to no language in the Servicing Contract that clearly evidences the parties' intent to permit him to enforce the agreement against CitiMortgage. While it is true that Fellows may benefit from the cancellation policies in the Servicing Guide, any such benefit is merely incidental to the purpose of the cancellation provisions. The primary purpose of these provisions is to provide guidance to CitiMortgage concerning PMI cancellation requirements to ensure that Fannie Mae is adequately protected against the risk of default until there is adequate equity in the property. Moreover, the Servicing Guide unambiguously states that a borrower, like Fellows, is *not* "intended to be a legal beneficiary of the [Servicing Contract] or to obtain any such rights or entitlements through our lender communications [including the Servicing Guide]." Other federal courts that have addressed this issue have "uniformly rejected" the notion that borrowers are third-party beneficiaries of servicing guides. *See Wells Fargo Bank, N.A. v. Sinnott*, No. 07 Civ. 169(WKS), 2009 WL 3157380, at *11–*12 (D.Vt. Sept. 25, 2009) (citing cases). Accordingly, Fellows has failed to state a claim for breach of contract and therefore, this claim shall be dismissed.[32]

---

**32.** It bears mention that even if the Servicing Guide were incorporated into Fellows' Mortgage, CitiMortgage's conduct in this case did not violate the Servicing Guide. First, the Servicing Guide requires no greater disclosure concerning PMI cancellation rights than that required under the HPA. Second, CitiMortgage's refusal to cancel PMI complied with the terms of the Servicing Guide. The amended complaint alleges that Fellows requested that CitiMortgage cancel the PMI on three occasions. The first two refusals occurred when the Mortgage was less than two years old. Under the Servicing Guide, PMI generally cannot be cancelled for any mort-

gage that is less than two years old unless structural improvements have increased the property value. CitiMortgage notified Fellows of this requirement and the amended complaint does not allege that any structural improvements had been made to the Property. At the time of the third refusal, the Mortgage was between two and five years old. Under the Servicing Guide, Fellows would have been eligible to request cancellation of the PMI if the LTV ratio for the Property was 75 percent or lower. As of the time of CitiMortgage's third refusal, the principal balance on the Mortgage was still 85 percent of

### 6. Implied Covenant of Good Faith and Fair Dealing

██ Lastly, the amended complaint alleges that CitiMortgage breached the implied covenant of good faith and fair dealing. In support of this claim, Fellows alleges that CitiMortgage: (1) wrongfully refused to cancel the PMI on the Mortgage; (2) provided inadequate and materially deceptive disclosures concerning his PMI cancellation rights; (3) considered the acquisition date, not the origination date, of the Mortgage for purposes of determining eligibility for PMI cancellation; (4) failed to have a procedure in place to enable PMI cancellation on the second anniversary of the Mortgage; and (5) deceptively undervalued the Property to avoid PMI cancellation.

██ New York law implies a covenant of good faith and fair dealing "pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407 (2d Cir.2006) (citation omitted). The covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract. It does not add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.,* 418 F.3d 187, 198–99 (2d Cir.2005) (citation omitted). New York law does not, however, recognize a separate cause of action for breach of the implied covenant of good faith and a breach of contract on the same facts. *See New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 770 (1995).

██ Fellows' claim for breach of the implied covenant fails as a matter of law. Fellows' allegations are duplicative of those underlying his breach of contract claim, or seek to impose duties upon CitiMortgage beyond those imposed by the Mortgage. The allegations in the amended complaint are therefore inadequate to give rise to a plausible claim that CitiMortgage violated the implied covenant. Accordingly, this claim is dismissed.[33]

### CONCLUSION

CitiMortgage's November 2, 2009 motion to dismiss is granted. The amended complaint is dismissed with prejudice. The Clerk of Court shall close the case.

SO ORDERED.

---

the value of the Property based on a recent appraisal obtained by CitiMortgage. Although Fellows accuses CitiMortgage of deliberately undervaluing the Property, this is nothing more than an unsubstantiated conclusory allegation. As such, Fellows has not alleged sufficient facts to demonstrate that CitiMortgage violated the Servicing Guide.

33. Despite being warned that the July 2009 amendment would be his final opportunity to amend his pleadings, in his opposition, Fellows raises three brand new claims against CitiMortgage: promissory estoppel, agency, and the torts of nonfeasance, misfeasance, and/or malfeasance. A "party may not amend [a] pleading through statements in briefs." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998) (citation omitted). These claims do not appear in the amended complaint and shall not be considered.