Bethany A. **GREGOR** and Clovis C. **Gregor, on behalf of the plaintiffs and the classes, Plaintiffs,**

v.

**AURORA BANK FSB, formerly known as Lehman Brothers Bank, FSB, and Federal National Mortgage Association, Defendants.**

C.A. No. 13–218.

United States District Court, D. Rhode Island.

Signed June 18, 2014.

Chethan G. Shetty, J. Matthew Goodin, Locke Lord LLP, Chicago, IL, David J. Pellegrino, Robert K. Taylor, Partridge, Snow & Hahn LLP, Maura K. McKelvey, Samuel C. Bodurtha, Hinshaw & Culbertson LLP, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

RONALD R. LAGUEUX, Senior District Judge.

This matter is before the Court on motions to dismiss brought by both Defendants. Plaintiffs Bethany A. Gregor and Clovis C. Gregor ("Plaintiffs") allege that the bank that provided their home mortgage loan fraudulently failed to make required disclosures to them at the time of the loan's closing. Plaintiffs seek to represent a class of similarly-situated home owners. Defendant Aurora Bank FSB, formerly known as Lehman Brothers Bank, FSB (hereinafter "Aurora" in reference to both entities), has moved to dismiss two pendent state law claims on the grounds that these claims are preempted by the federal statute on which Count I is based. Defendant Federal National Mortgage Association ("Fannie Mae") moves to dismiss all counts against it, based on its assertion that it was not a party to the transaction which is the subject of the lawsuit. For the reasons explained below, the Court grants both motions of Defendants, dismissing two claims against Aurora, and dismissing all claims against Fannie Mae.

### Background

In February 2007, Plaintiffs obtained a mortgage loan from Aurora for their Pawtucket, Rhode Island, residence. Soon after the loan's closing, Aurora sold the loan to Fannie Mae. In January 2013, Plaintiffs tried to refinance their mortgage, seeking a more favorable interest rate than had

Richard S. Showkier, Richard S. Showkier, Esq., Fall River, MA, Catherine A. Ceko, Cathleen M. Combs, Daniel A. Edelman, Edelman, Combs, Latturner & Goodwin, LLC, Chicago, IL, for Plaintiffs.

been available in 2007. Their efforts encountered an unforeseen obstacle: the loan was burdened by a mortgage insurance policy purchased by Aurora. The presence of mortgage insurance on the loan made it impossible for Plaintiffs to refinance their loan at a lower rate of interest, or to take advantage of the federal home-owner assistance program, the Home Affordable Refinance Program or "HARP." According to Plaintiffs, Aurora failed to tell them about the mortgage insurance policy at the time of the closing, as is required by law. Moreover, Plaintiffs state that they were never informed that their mortgage had been sold to Fannie Mae.

Banks often require mortgage insurance on a loan when the amount of the loan is more than eighty-percent of the value of the property. This type of insurance provides protection to lenders from the risks of borrowers' defaults, while providing an opportunity for home-buyers to purchase a house even if they haven't saved enough for the customary twenty-percent down-payment. Sometimes lenders require the borrowers to purchase the insurance and pay the premiums; in other instances, lenders purchase the policy themselves, passing the cost along to the borrowers in the form of higher interest rates. In the early 2000s, many banks waived (or claimed to waive) the mortgage insurance requirement, even for high-ratio loans, in order to more competitively market their services to home-buyers.

According to Plaintiffs, Aurora had the intention, at the time of the loan's consummation, to sell the loan to Fannie Mae. Aurora knew that Fannie Mae would require mortgage insurance on Plaintiffs' loan because of its high loan-to-value ratio. In their Amended Complaint, Plaintiffs allege that "based on normal industry practice, Aurora and FNMA [Fannie Mae] acted in concert with regards to the origination and sale of the loan." Plaintiffs allege further that both Defendants were aware of the plan to place mortgage insurance on Plaintiffs' property prior to the closing. Nonetheless, the closing documents represented that there was no mortgage insurance on the property. This representation was made by way of omission—the space for disclosure of mortgage insurance was left blank.

### The Complaint

Plaintiffs' First Amended Complaint ("the Complaint") states three causes of action against both Defendants (on behalf of themselves and similarly-situated borrowers).[1] Count I asserts that both Defendants violated the federal Homeowners Protection Act, 12 U.S.C. § 4905, by failing to disclose the lender-purchased mortgage insurance on their property at the closing. Count II is for fraudulent concealment, claiming that both Defendants, with intent to deceive, concealed from Plaintiffs the fact that the loan was encumbered by mortgage insurance, with the result that it is now impossible for Plaintiffs to refinance their home. Count III asserts that Defendants were unjustly enriched when they 1) wrongfully purchased mortgage insurance for the loan thereby making it more marketable on the secondary market, solely for their own benefit; 2) charged Plaintiffs higher rates of interest on the loan; and 3) when they continued to collect interest on the loan at a higher rate than Plaintiffs would have had to pay had they been able to refinance their mortgage in 2013. Plaintiffs seek actual damages, statutory damages, punitive damages, attorneys' fees

---

1. Because a class has not been certified, this Court will focus on the claims brought by the Gregors.

and costs, as well as an order requiring Defendants to cancel the mortgage insurance on the loan.

### Standard of review

Defendants move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted. In considering a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996). The United States Supreme Court has recently refashioned the standard as follows: "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Since *Twombly*, the Supreme Court further refined its requirements in *Ashcroft v. Iqbal:*

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citations and quotations omitted). The *Iqbal* Court added that, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### Analysis

### Aurora

Because the Defendants are situated differently, the Court will address them individually, starting with Defendant Aurora. Aurora has not moved to dismiss Count I, which alleges that it violated the federal Homeowners Protection Act, 12 U.S.C. § 4905, when it failed to disclose to Plaintiffs the lender-paid private mortgage insurance placed on their loan. Aurora moves to dismiss Counts II and III, claims for fraudulent concealment and unjust enrichment, arguing that these state law claims are preempted by the Homeowners Protection Act (or "HPA"). Plaintiffs counter that the HPA preempts only state laws that create regulatory duplication or that are inconsistent with the operation of the Act, and that, consequently, their claims for fraudulent concealment and unjust enrichment are viable.

### The Homeowners Protection Act

The federal Homeowners Protection Act, 12 U.S.C. §§ 4901 *et seq.*, sets forth requirements and restrictions on the placement of private mortgage insurance on residential mortgages. Section 4905 addresses lender-paid mortgage insurance, and mandates written notice requirements that must be provided by the lender to the borrower "not later than the date on which a loan commitment is made for the residential mortgage transaction." Section 4907 establishes a civil liability scheme for violations of the statute, including statutory damages, actual damages and interest.

Congress enacted the Homeowners Protection Act in 1998 based on evidence that homeowners were having difficulty cancelling lender-paid mortgage insurance, even after they had accumulated sufficient equity in their homes (over 20%) so that the

insurance was no longer required. The cost of the insurance premiums was charged to the homeowners, and some of these borrowers wound up paying for the insurance for the life of their loans. Because the insurance generally only covered the first 20% of the home's value, even the lenders were not receiving any benefit from the retention of the insurance for this duration. *Senate Report No. 105–129* at 3 (1997), 1998 U.S.C.C.A.N. 313.

### *The preemptive sweep of § 4908*

On the issue of preemption, the above-cited Senate Report explained that the Act would not result in an increased regulatory burden on banks because, "The bill also provides broad preemptive language that will minimize compliance costs with respect to state laws." *Id.* at 9. Section 4908 sets forth the parameters of the Act's preemption power:

(a) Effect on State law

(1) In general

With respect to any residential mortgage or residential mortgage transaction consummated after the effective date of this chapter, and except as provided in paragraph (2), *the provisions of this chapter shall supersede any provisions of the law of any State relating to requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions, cancellation or automatic termination of such private mortgage ·insurance, any disclosure of information addressed by this chapter, and any other matter specifically addressed by this chapter.*

(2) Protection of existing State laws

(A) In general

The provisions of this chapter do not supersede protected State laws, except to the extent that the protected State laws are inconsistent with any provision

of this chapter, and then only to the extent of the inconsistency.

(B) Inconsistencies

A protected State law shall not be considered to be inconsistent with a provision of this chapter if the protected State law—

(i) requires termination of private mortgage insurance or other mortgage guaranty insurance—

(I) at a date earlier than as provided in this chapter; or

(II) when a mortgage principal balance is achieved that is higher than as provided in this chapter; or

(ii) requires disclosure of information—

(I) that provides more information than the information required by this chapter; or

(II) more often or at a date earlier than is required by this chapter.

(C) Protected State laws

For purposes of this paragraph, the term "protected State law" means a State law—

(i) regarding any requirements relating to private mortgage insurance in connection with residential mortgage transactions;

(ii) that was enacted not later than 2 years after July 29, 1998; and

(iii) that is the law of a State that had in effect, on or before January 2, 1998, any State law described in clause (i).

12 U.S.C. § 4908(a) (emphasis added).

As of this writing, only a handful of courts have analyzed this language, with differing results. In *Fellows v. CitiMortgage, Inc.,* 710 F.Supp.2d 385 (S.D.N.Y. 2010), the District Court dismissed a claim for violation of New York's deceptive trade practices act, holding that it was preempted by the Homeowners Protection Act. In

that case, the borrower alleged that the mortgage servicer refused to cancel the borrower-paid mortgage insurance and failed to provide him with information about his cancellation rights.

With no HPA precedent to turn to, the *Fellows* court looked to case law interpreting ERISA,[2] which has preemption language similar to that found in the HPA. ERISA's preemption clause, which has been consistently interpreted to exercise a broad sweep, states that its provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The HPA's provision, included in full above, states that it "shall supersede any provisions of the law of any State relating to requirements for obtaining ... private mortgage insurance, cancellation ..., any disclosure of information ..., and any other matter specifically addressed by this chapter." The *Fellows* Court pointed out that when Congress reuses a phrase that has been consistently interpreted in one manner—such as "any State law relating to"—Congress is signaling that the new statutory language should be interpreted in the same manner. 710 F.Supp.2d at 399 (*citing Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008))("When judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well.")

While the *Fellows* ruling was limited to the State's deceptive trade practices act, the court acknowledged the HPA's preemptive breadth:

In light of the judicial interpretation of words "relating to" in the context of ERISA and the ADA, it is clear that the preemptive reach of the HPA is expansive. With the exception of "protected State laws," the HPA preempts all state laws that have "a connection with" or "reference to" requirements for, *inter alia,* cancellation of PMI and disclosure of information concerning PMI cancellation.

710 F.Supp.2d at 401.

Citing the legislative history and Congress' concern about regulatory burden, the *Fellows* court determined further that permitting a claim to advance under the State's deceptive trade practice act would undermine Congress' express objective of creating a uniform national standard for mortgage insurance disclosure and cancellation. *Id.* at 402. Moreover, the state claim would also undermine the HPA's operation by interfering with its civil enforcement mechanism, which bestows enforcement powers on federal banking regulators and provides borrowers with a private right of action. *Id.* at 402.

A Virginia case, with a slightly different fact pattern, resulted in a contrary ruling. In *Scott v. GMAC Mortgage,* 2010 WL 3340518 (W.D.Va.), the Scotts refinanced their current GMAC mortgage in order to eliminate the borrower-paid mortgage insurance that encumbered it. Before entering into the new loan arrangement, they were assured by GMAC that there would be no mortgage insurance on the refinanced loan. The closing documents were consistent with this representation. Several years later, when the Scotts attempted to refinance the loan with another company, they were turned down because of lender-paid mortgage insurance on the

**2.** The Employee Retirement Income Security Act, 29 U.S.C. § 1144(a). The *Fellows* Court also looked to similarly broad preemptive language in the Airline Deregulation Act of 1978, 49 U.S.C. § 41713(b)(1) ("the ADA").

GMAC-refinanced loan. Despite its initial denials, GMAC eventually admitted that it had placed insurance on the mortgage.

The Scotts sued GMAC for violating the Homeowners Protection Act, as well as for fraud and constructive fraud. The Court held that the fraud claims were not preempted because they were "altogether distinct and beyond the objectives of the HPA." *Id.* at \*5. In delivering the ruling, the *Scott* court cited the historic presumption against federal preemption of the states' police powers. *Id.* at \*4. The HPA did not expressly preempt state fraud claims, the court determined, because Congress intended only to preempt state laws that actually 'related to' requirements for mortgage insurance. *Id.* at \*4. Nor would the fraud claims frustrate Congress' purpose in enacting the HPA, the Court found further. *Id.* at \*5. Congress' objective was to create a uniform regulatory scheme for mortgage insurance. This scheme would not be impeded by the common law fraud claims:

> The instant fraud claims do not threaten the structural integrity of those regulations. The fraud claims raised are claims of general application. They do not directly relate to the disclosure requirements enumerated in § 4905.

*Id.* at \*5.

The court explained that the distinction between the HPA claim and the fraud claims was further underscored by the difference in evidence that would be required to support the claims: "The HPA claims depend on evidence of failure to disclose. The fraud claims depend on evidence of an affirmative misrepresentation of material fact. The two are unrelated." *Id.* at \*5.

The next case was *Dwoskin v. Bank of America,* 850 F.Supp.2d 557 (D.Md.2012), decided by the District Court of Maryland. In this case, Bank of America had marketed a no-fee mortgage product, including an express representation that no mortgage insurance would be placed on the advertised loans. The Dwoskins received a loan of this kind, only to discover later that there was lender-paid mortgage insurance on the loan and that, consequently, the loan could not be refinanced. The Dwoskins sued, claiming fraud, negligent misrepresentation, unjust enrichment and violations of the HPA and Maryland's consumer protection act. Denying the Bank's motion to dismiss, the Court permitted all claims to go forward, ruling particularly that the claims for fraud and negligent misrepresentation, and the violation of the State consumer protection statute were not preempted by the HPA. *Id.* at 568–69. As with the *Scott* decision, the *Dwoskin* court held that claims for fraud and negligent misrepresentation stemmed from a duty separate from those imposed by the HPA; *i.e.,* the duty to refrain from lying or misrepresenting material information. *Id.* at 568. The Dwoskins alleged that the Bank had knowingly made false statements to them. "Proving such a claim," the court wrote, "will not focus on the detailed disclosure provisions of the HPA, but rather on the Bank's alleged false representation to the plaintiffs." *Id.* at 568. Likewise, the court concluded, the claim brought under the State consumer protection statute "seek[s] to enforce a general claim that a business cannot tell a customer one thing and then proceed to do another." *Id.* at 569.

In *Augustson v. Bank of America,* 864 F.Supp.2d 422 (E.D.N.C.2012), the preemption pendulum swung back. Auguston, and a handful of other named-plaintiffs, obtained the same no-fee mortgage product from Bank of America as in *Dwoskin.* The Bank advertised the product as being mortgage-insurance-free because the Bank was able to self-insure the loan with its extensive reserves. Nevertheless,

without the plaintiffs' knowledge, the Bank procured lender-paid mortgage insurance on their loans and charged them a higher interest rate to cover the cost. The plaintiffs' claims included one under the Homeowners Protection Act, and three state law claims: fraud, negligent misrepresentation and unjust enrichment. On the Bank's motion, the court dismissed the state law claims.

As with *Fellows*, the judge in *Augustson* drew the analogy between the HPA and ERISA, pointing out that under ERISA's broad preemption language, "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Id.* at 434 (*quoting Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). The court explained that ERISA generally preempts three categories of state laws: 1) state laws that mandate employee benefits plans; 2) state laws that bind employers to particular types of benefits plans; and 3) state laws that provide alternate enforcement mechanisms for employees to obtain their ERISA benefits. *Id.* at 435.

> A state-law claim provides "an alternate enforcement mechanism" for obtaining benefits when it rests on the same allegations that support an ERISA claim and is brought by an employee against a defendant owing a plan-created fiduciary duty to the employee.

*Id.* The court then concluded that Congress intended HPA's preemptive power to be as broad as ERISA's. Consequently:

> State law claims sounding in tort but which are based on the allegedly wrongful denial. . . . of benefits under [a federally regulated program or plan subject to broad preemption] are preempted. Notably, plaintiffs' fraud and negligent misrepresentation claims depend on the existence of HPA-covered mortgages,

and the court would have to review their mortgages and disclosures relating to private mortgage insurance to evaluate their claims.

*Id.* at 437 (internal citations omitted). The judge also ruled that the unjust enrichment claim was preempted. *Id.* at 438.

A footnote to this collection of cases is that the *Augustson* plaintiffs abandoned their North Carolina litigation, and joined the *Dwoskin* plaintiffs in Maryland. *See Dwoskin v. Bank of America*, 2013 WL 427362 (D.Md.). The newly-augmented *Dwoskin* group filed an amended complaint, seeking nationwide-class certification, and setting forth three claims: 1) violation of the HPA; 2) violation of various pertinent state consumer protection laws; and 3) unjust enrichment. Bank of America renewed its motion to dismiss and sought an order permitting an interlocutory appeal of the first *Dwoskin* ruling on preemption. The Bank's motions were denied, except that the state law claims of the former *Augustson* plaintiffs were dismissed because they had been previously adjudicated and dismissed with prejudice in North Carolina's District Court. It appears from the docket that settlement conferences are currently taking place on the remaining issues.

### *This Court's ruling*

■ This Court finds the *Augustson* ruling to be persuasive. As was pointed out both by *Augustson* and *Fellows*, when Congress re-uses language with a solidly-established interpretation such as the "relating to" language found in ERISA, the newly-repeated language should be interpreted consistently. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

Moreover, while the state law claims filed by the Gregors do not explicitly conflict with their HPA claim, they are dupli-

cative and, consequently, operate as alternate enforcement mechanisms to those provided in the Section 4907 of the HPA. In fact, the redundancy of the Gregors' state claims is even more distinct than in the other cases outlined above. For example, in *Augustson*, Bank of America allegedly made false representations to induce potential borrowers to choose their services, prior to entering into the loan transactions. Nonetheless, that court held that the claims concerning those advertisements or inducements related to "requirements for obtaining or maintaining private mortgage insurance in connection with residential mortgage transactions." 12 U.S.C. § 4908(a)(1). In the present case, Plaintiffs' claims for fraudulent concealment and unjust enrichment, as well as their claim for violation of the HPA, all stem from the same single action (or inaction) on the part of Aurora—that is, the act of leaving blank the space for the disclosure of mortgage insurance. In the present case, the conduct that forms the basis of Plaintiffs' state law claims duplicates precisely the conduct they claim violates the HPA. For this reason, the state law claims, if permitted to go forward, would function as an alternate enforcement mechanism, echoing the enforcement provisions of the HPA, and frustrating Congress' objective of a uniform regulatory scheme. Therefore, Plaintiffs' claims for fraudulent concealment and unjust enrichment are preempted by the HPA. Aurora's motion to dismiss Counts II and III is granted.

### Fannie Mae

In their Complaint, Plaintiffs allege that Aurora and Fannie Mae "acted in concert with regards to the origination and sale of the loan, and its sale to FNMA by Aurora was contemplated prior to closing." Complaint ¶ 10. Specifically, Plaintiffs allege, Aurora knew that Fannie Mae required lender-paid mortgage insurance for loans with high loan to value ratios, and that Fannie Mae "requested the Lender Paid PMI" and was aware of its placement prior to the closing. Complaint ¶ 17. Plaintiffs go on to state that Aurora "is the agent of an undisclosed principal and therefore responsible for the actions taken by FNMA with respect to plaintiffs." Complaint ¶ 20. Following these allegations linking Defendants together, Plaintiffs state the same three causes of action against Fannie Mae as they assert against Aurora: 1) violation of the Homeowners Protection Act; 2) fraudulent concealment; and 3) unjust enrichment.

Fannie Mae moves to dismiss all three counts, arguing that it is not covered by the HPA's disclosure requirements in connection with the Gregors' loan, and that Plaintiffs have failed to assert requisite elements of the state laws claims. Fannie Mae's arguments, set forth in its memorandum of law supporting its motion to dismiss, are unassailable. Nonetheless, the Court dismisses the claims against Fannie Mae on additional and alternate grounds.

First, the state law claims against Fannie Mae are preempted by the Homeowners' Protection Act. In their Complaint, Plaintiffs attempt to hold Fannie Mae responsible for the single act of omission that underpins their claims against Aurora—leaving blank the space for the disclosure of mortgage insurance on the mortgage closing documents. Because these claims constitute alternate enforcement mechanisms, duplicating the HPA violation, they are preempted by the HPA.

As for Count I, the claim of violation of the HPA against Fannie Mae, Fannie Mae argues correctly that the Act's provisions do not apply to the role it played in the Gregors' mortgage transaction. According to the Gregors, Aurora

sold their loan to Fannie Mae soon after the closing, according to a prior collusive agreement. Section 4903(a) requires certain disclosures to be made by mortgagee to the mortgagor "at the time at which the transaction is consummated." However nefarious the scheme might have been between Aurora and Fannie Mae, the plain language of the statute fails to impose disclosure responsibilities on the secondary loan purchaser.[3]

### Ashcroft v. Iqbal

In addition, Plaintiffs' claims against Fannie Mae must be dismissed because they fail adequately to state a claim for relief pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiffs' efforts to link Fannie Mae to Aurora's alleged disclosure omission fail to satisfy the standard established by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937, which requires that, to be accepted as true, a claim must be "plausible on its face." To achieve facial plausibility, a plaintiff must plead facts sufficient to permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

■ Here, Plaintiffs assert that Aurora and Fannie Mae had an agreement to secretly place mortgage insurance on their loan. However, they provide no factual assertions to support this claim. Plaintiffs assert that Aurora "is the agent of an undisclosed principal and therefore responsible for the actions taken by FNMA." However, there are no allegations that Fannie Mae played any role, or undertook any actions, in connection with the closing. If Plaintiffs actually mean that Fannie Mae is the undisclosed principal and therefore responsible for Aurora's actions, this assertion is similarly unsupported. Simply mentioning a legal doctrine in the Com-

plaint is insufficient to allow the Court to draw a reasonable inference that Fannie Mae is liable for failing to disclose the mortgage insurance. Besides, it is this writer's understanding that an agent's failure to disclose the role of the principal in a transaction operates to impose liability on the agent. *See Metcalf v. Williams*, 104 U.S. 93, 98, 26 L.Ed. 665 (1881); *K & S Services, Inc. v. The Schulz Elec. Group of Cos.*, 670 F.Supp.2d 91, 94 (D.Me.2009).

■ At the hearing before this Court, Plaintiffs argued that Aurora and Fannie Mae had participated in a "joint venture." As with the agency argument, simply saying it does not make it so. To establish a joint venture, certain facts must be alleged concerning the parties' intent and joint control to effect a common purpose. *See Berman v. Sitrin*, 991 A.2d 1038, 1046 (R.I.2010). These factual allegations have not been set forth. Instead, Plaintiffs allege: 1) that Fannie Mae required mortgage insurance on high loan-to-value mortgages; 2) that mortgage insurance was placed on their loan; and 3) that their loan was sold by Aurora to Fannie Mae. Based on these three factual allegations, Plaintiffs deduce that there was a synchronized scheme sufficient to impute liability for Aurora's conduct to Fannie Mae. This kind of deductive leap, or conclusory statement, is insufficiently "plausible on its face" to satisfy the pleading requirements set forth in *Ashcroft v. Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

For these reasons, the Court grants Fannie Mae's motion to dismiss all three counts against it.

### Conclusion

For the reasons set forth above, this Court grants Defendants' motions to dis-

---

**3.** Section 4903(b) imposes ongoing disclosure requirements on loan servicers; however, Plaintiffs do not allege that Fannie Mae was their loan servicer.

**156**

miss. Defendant Federal National Mortgage Association is dismissed from the lawsuit. One claim remains against Defendant Aurora Bank FSB (formerly known as Lehman Brothers Bank, FSB) for violation of the Homeowners Protection Act. The Court will set a schedule for the remaining issues at an appropriate time.

No judgment shall enter until all claims have been resolved.

It is so ordered.